PROFESSIONAL INSURANCE AGENTS OF MICHIGAN, Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 82–1591.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 8, 1983.

Decided Jan. 26, 1984.

Rehearing and Rehearing En Banc Denied March 26, 1984.

Joseph Falcone, argued, Lieberman & Falcone, P.C., Southfield, Mich., for petitioner-appellant.

Kenneth W. Gideon, Chief Counsel, John H. Menzel, I.R.S., Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Chief, Appellate Section, Robert A. Bernstein, David I. Pincus, argued, Tax. Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before ENGEL and KENNEDY, Circuit Judges, and MORTON, Chief District Judge.*

MORTON, Chief District Judge.

Professional Insurance Agents of Michigan (PIA), is a trade association exempt from federal income taxation as a "business league" under Section 501(c)(6) of the Internal Revenue Code of 1954. PIA was formed in 1937, incorporated as a non-profit corporation under the laws of Michigan in 1956, and received an Internal Revenue Service ruling that it qualified as an exempt organization in 1958. PIA's Articles of Incorporation describe its objectives as follows:

> The object of this Association shall be to maintain and extend the American Agency System, which system is defined to be the production of insurance premiums and service of insurance contracts by insurance agents operating solely on a commission basis on their own account as independent contractors, owning their own expirations and who maintain their own offices separate from any insurance company; to promote the equitable rights of its members; to provide its members with increased knowledge thru education in insurance underwriting and selling, loss prevention and agency management; to promote a high standard of ethics, friendship and cooperation among its

---

* The Honorable L. Clure Morton, Chief District Judge, United States District Court for the Middle District of Tennessee, sitting by designation.

members, to better serve the public, themselves, their companies and to professionalize the industry; to oppose bad practices of insurance and to cooperate with the Department of Insurance of the State of Michigan.

About 1,000 of the nearly 2,400 eligible Michigan insurance agents belonged to PIA. Many of the other agents belonged to a rival trade organization known as Independent Insurance Agents of Michigan. The average PIA member was a relatively small insurance agency with 3–5 employees, writing primarily personal lines of coverage such as automobile and homeowners' insurance.

An insurance agent, upon becoming a member of PIA, automatically became a member of the National Association of Professional Insurance Agents (National Association). The National Association was a nationwide organization of insurance agents whose membership consisted of the members of its various state and regional affiliates. Despite their shared membership, PIA and the National Association were separate organizations operating independently of one another. The governing body of the National Association was a board of directors comprised of two or three directors elected by each local organization.

During the tax years at issue, PIA endorsed or promoted to its membership several different group insurance programs underwritten by private insurance companies. These programs were: (1) an "Errors and Omissions" liability policy sponsored by the National Association and underwritten by the Utica Mutual Insurance Company; (2) a group life and health insurance policy sponsored by PIA and underwritten by the Independent Liberty Life Insurance Company; and (3) a group life and disability policy sponsored by the National Association and underwritten by unspecified insurance companies. PIA also had at one time (prior to beginning its agreement with Independent Liberty) sponsored a group health, life, and disability program underwritten by the Time Insurance Company. PIA received a refund with respect to Time Insurance Company's program during its fiscal year ending September 30, 1975. The above three programs and the Time Insurance refund will now be discussed in turn.

Errors and Omissions Insurance (sponsored by the National Association)

Errors and Omissions (E & O) insurance is a type of professional malpractice insurance which protects the insurance agent from liability in the event his client suffers a loss as a result of errors made in writing a policy. The insurance is expensive and difficult to underwrite, and the insurance carriers who offer it prefer to spread their risk by selling to a national market on a group, rather than an individual, basis. As a result, the market for coverage on an individual basis was both limited and volatile, with insurance companies occasionally finding it necessary to discontinue the coverage soon after entering the market.

In order to increase the availability of the insurance and maintain continuity of coverage, the National Association agreed to sponsor an E & O program carried by the Utica Mutual Insurance Company. PIA also performed services in connection with the program, including putting certain brochures describing the program and schedules from which a member could calculate his premiums into the membership packets which PIA distributed to new and prospective members; promoting the insurance at educational seminars and in PIA's official magazine; and answering telephone inquiries concerning the program. However, the E & O program could have been available to the PIA's members through the National Association without PIA's participating therein. Utica Mutual paid the National Association a fee equal to 15 percent of gross premiums for the latter's sponsorship of the E & O program. The National Association in turn gave PIA an amount equal to 8 percent of the premiums paid by its members, as compensation for PIA's efforts in promoting the program. While the National Association was not contractually obligated to make these payments to PIA, PIA's executive vice president testified that if the National had stopped making them

he would have recommended to PIA's board of directors that they drop the National's E & O insurance program entirely and look for an acceptable substitute sponsor.

During the years at issue approximately 75 to 80 percent of PIA's members subscribed to the E & O coverage sponsored by the National Association. Non-member insurance agents were also permitted to enroll in the plan. The fees received by PIA for its E & O promotional activities amounted to $21,242, $25,978, and $32,991, during the three taxable years here at issue.

### Group health and life insurance (sponsored by PIA)

During the years at issue, PIA sponsored a group health and life insurance policy offered by the Independent Liberty Life Insurance Company. As the sponsor, PIA performed several promotional and administrative services for the insurance company, as set forth in a 1974 letter from the company to PIA:

> The Association [PIA] will perform certain services on behalf of Independent Liberty such as: Publicizing the program and collecting applications, maintaining an inventory and issuing group certificates, reviewing all claims for submission to the company's claims department, disbursing claim drafts, coordinating communications between the company and the membership regarding underwriting and claim problems, and assisting the company in making other company products available to the general membership. Because these services are to be performed on behalf of Independent Liberty to provide better service for the association members, we will reimburse the Association for a portion of its increased administrative cost by paying a service fee of 6% of the monthly collected premium. The Association should receive the service fee shortly after the close of each month and will continue as long as the Association continues to provide the agreed upon services.

The above-mentioned six percent fee amounted to $16,709, $27,576, and $24,570, during the 3 taxable years here at issue.

Access to low cost group health and life insurance was important to PIA's member agencies because it helped them to compete for employees in the marketplace. However, several other multiple-employer group insurance plans were open to insurance agencies and were operating in Michigan during the years at issue.

Somewhere between 20 and 30 percent of the members participated in the Independent Liberty program. Those who did not do so generally fell into one of two groups: (1) those with few or no employees who had no need for group insurance benefits, or (2) those with 10 or more employees who chose to negotiate their own plan directly with an insurance company.

### Group life and disability insurance (sponsored by the National Association)

PIA also promoted to its members several group life and disability insurance programs which were sponsored by the National Association and underwritten by various private insurance companies. The services PIA performed in connection with these plans were similar to the services it provided in connection with the National Association's E & O program, and included the mailing of descriptive brochures to new or prospective members as part of their membership packet. In return for its promotional efforts PIA received a fee from the National Association equal to 4 percent of all premiums paid by its members. This 4 percent fee amounted to $5,183, $8,103, and $7,294 during the 3 taxable years here at issue.

### Experience rating reserve refund

From 1964 through December 31, 1973, PIA directly, or through its nonexempt subsidiary, Agent's Service Exchange, provided a group health, life and disability insurance program to its members through a master group insurance policy with Time Insurance Company. One aspect of this policy was a provision permitting the insurance company to maintain an "experience rating reserve." An "experience rating reserve" is a sum, taken from the insured individuals' premium payments, that is set aside by the insur-

ance company to protect it against the possibility that the claims made under the policy turn out to be larger than anticipated. In the event that larger-than-anticipated losses do not materialize, the insurance company refunds the reserve to the master policyholder.

By letter dated November 12, 1973, PIA notified Time Insurance that all policies between them would be cancelled as of January 1, 1974, the next quarterly renewal date. In its response, Time Insurance stated that it would make a final accounting to applicant concerning the experience rating reserve 1 year after the January 1, 1974, policy termination date. This 1-year claim-lag period was provided in order to insure that most, if not all, claims arising under the policy prior to the termination date were filed and settled before the balance remaining in the reserve was refunded.

In March 1975, representatives of PIA and Time Insurance executed the following agreement with respect to Time's refunding of the experience rating reserve:

It is agreed that Time Insurance Company will refund to Michigan Association of Mutual Insurance Agents [PIA] a sum in the amount of $43,227.76, in accordance with the Experience Rating Refund formula, upon written acceptance of this release which provides for the following two stipulations:

1. The distribution of such funds to members of the Association is the sole obligation of the Association, and,

2. Any benefits yet to be paid under the above-named group contract shall be paid by Time Insurance Company only upon the receipt from the Association of the necessary funds. This stipulation shall not bind the Association to any sum, in aggregate, greater than the fund herewith returned.

Pursuant to this agreement, PIA received a refund check from Time Insurance in the amount of $43,227. PIA, however, did not segregate or otherwise earmark this sum to indicate that it was being held in trust. Instead, it deposited the refund check in its general checking account and enjoyed full use and control of the funds thereafter. PIA made no effort to distribute the funds to its members.

No additional claims under the Time Insurance Company policy were made following the expiration of the 1-year claim-lag period. Consequently, PIA was never called upon to return to Time Insurance any portion of its refund in order to meet any such claim.

The Professional Insurance Agents of Michigan (PIA) is a business league exempt from taxation under the provisions of 501(c)(6) of the Internal Revenue Code. The issue presented by this case is whether or not the income which had been received by PIA through the payment of a percentage of the insurance premium income [1] constituted unrelated business income in accordance with Section 511 of the Internal Revenue Code. The income is taxable only if two conditions are present: (1) The income must be from a trade or business regularly carried on by the organization and (2) the trade or business must not be substantially related to the exempt purposes.

PIA, as previously stated, is a tax exempt business league under the provisions of Section 501(c)(6). Its operating income is derived from the splitting of insurance premiums with the sponsor of the insurance programs which were made available to the membership of PIA. Thus, at issue is the characterization and taxability of the revenue so produced. Section 511(a)(1), as previously stated imposes a tax on unrelated business taxable income. Unrelated business income is defined in Section 512(a) as being gross income derived by any organization from any unrelated trade or business regularly carried on by it. Unrelated trade or business is defined in Section 513 of the Code as being such trade or business, the conduct of which is not substantially related to the exercise or performance by such organization of its function constituting the basis for its exemption under Section 501.

---

1. This includes the experience rating reserve fund.

As set forth in the regulations of the Internal Revenue Code, Treasury Regulation 1.513–1(a) defines three items which are to be used in determining whether the amounts received by the tax exempt organization constitute unrelated business tax income, to-wit: (1) if the income is from a trade or business; (2) if the trade or business is regularly carried on by the organization; and (3) if the conduct of the trade or business is not substantially related to the organization's performance of its exempt functions (other than through the production of funds). Treas.Reg. § 1.513–1(a).

Thus in determining whether or not PIA has income from a trade or business, the term trade or business includes any activity that is carried on for the production of income from the sale of goods or the performance of services, IRC Section 513(c), and generally conveys the same meaning it does in Section 162. Treas.Reg. 1.513–1(b).

PIA, of course, contends that its insurance premium revenue is not unrelated business taxable income. It further asserts that its insurance promotion does not rise to the level of a trade or business. It is beyond peradventure that the insurance premium payments to PIA are income. The language of the statute states that any activity which is carried on for the production of income is to be deemed a trade or business. IRC § 513(c). The phrase "carried on for the production of income" limits the type of activities covered. That phrase requires us to examine the exempt organization's underlying reasons for engaging in the questioned activity. If it has as its motive the production of income, the activity constitutes a trade or business under Section 513(c), so, the language of the Code prescribes the application of the motive test. The regulations under Section 513 strengthen this interpretation of the statute by incorporating the Section 162 meaning of the term trade or business. "It is well established that the existence of a genuine profit motive is the most important criterion for the finding that a given course of activity constitutes a trade or business." *Lamont v. Commissioner of Internal Revenue,* 339 F.2d 377, 380 (2d Cir.1964). In addition to the intent to earn a profit, Section 162's definition of "trade or business" connotes "extensive activity over a substantial period of time during which the taxpayer holds himself out as a provider of goods and services." *McDowell v. Ribicoff,* 292 F.2d 174, 178 (3d Cir.1961).

■ It is the belief of this circuit that the "profit motive" standard is proper in that it is consistent with the language of Section 513, as well as the regulations thereunder. Section 513 and its regulations raise the question of motive in connection with any activity carried on for the production of income. The regulations which invoke Section 162 and its profit motive language confirm that motive is the key inquiry. Thus, the court must look to see whether PIA has engaged in extensive activity over a substantial period of time with intent to earn a profit. It seems clear to us that the record in this cause reflects that a profit motive existed. PIA selected the companies whose products and services would be endorsed and actively promoted among its members. PIA performed the day-to-day administrative services essential to the operation of those products and services. In fact, it would be difficult to imagine a more comprehensive involvement than that performed by PIA. Certainly it was rewarded for its efforts. Its activities were profitable and those profits are ever increasing. We hold that PIA's motive for offering the insurance policies at issue here, particularly in view of the statement of its president that absent a proper split of the insurance premiums a different company would have been selected, was one of profit sufficient to support a finding that the premiums it received were from a trade or business for the purpose of unrelated business tax income.

Having determined that the insurance activities of PIA constituted a trade or business under Section 513, the next step is to determine whether the trade or business is regularly carried on. Obviously, whatever the framework of the statute and regula-

tions, PIA cannot argue that its activities are not ongoing and continuous.

Thus we must now address whether or not PIA's activities are substantially related to its exempt function. Unless its insurance activities are substantially related to its exempt function, the income will be taxed as unrelated business income. Section 513(a) states that the need of an exempt organization for income does not constitute the necessary substantial relationship; so we must turn to the regulations to determine what type of relationship qualifies as substantial. The relevant regulation provides as follows:

> Trade or business is "related" to exempt purposes, in the relevant sense, only where the conduct of the business activities has causal relationship to the achievement of exempt purposes (other than through the production of income); and it is "substantially related," for purposes of section 513, only if the causal relationship is a substantial one. Thus, for the conduct of trade or business from which a particular amount of gross income is derived to be substantially related to purposes for which exemption is granted, the production or distribution of the goods or the performance of the services from which the gross income is derived must contribute importantly to the accomplishment of those purposes.

Treas.Reg. § 1.513–1(d)(2). Regulations Section 1.513–1(d)(3) states further that "[i]n determining whether activities contribute importantly to the accomplishment of an exempt purpose, the size and extent of the activities involved must be considered in relation to the nature and extent of the exempt function which they purport to serve." Treas.Reg. § 1.513–1(d)(3).

█ The purpose of PIA is "to promote the organization and development of independent insurance agents through the maintenance and extension of the American agency system; to promote the equitable rights of its members, to provide its members with increased knowledge through education in insurance underwriting and selling, etc.; to

better serve the public, themselves, their companies and to professionalize the industry; and to oppose bad practices of insurance."

Thus PIA's tax exempt purpose is to promote the agency system and through education to promote the common interest of its members in the insurance field. Therefore, to fall within the framework of the purposes of PIA, its activities must be substantially related to its stated purpose and must benefit its membership as a group, rather than in their individual capacities. Furthermore, the "substantial relationship" is a determination which is necessarily based upon the facts involved. Two factual elements are critical to the finding of the necessary substantial relationship between a business league's activities and its purposes: (1) the unique nature of the activities vis-a-vis the organizational function, and (2) the capacity in which benefits are received by the organization's members.

For the activities of an exempt business to be related to its exempt function, those activities must be unique to the organization's tax exempt purpose. Such services as educational training programs and promotion of learning within the insurance industry clearly satisfy this uniqueness test since they advance the purpose of the tax exempt entity. Thus, as can be seen, it is the educational ends that must be served if the activity is to be deemed substantially related. Educational and advertising services are peculiarly suitable activities for a business league because they further a common interest that unites the association members. Therefore, the providing of these services for a membership fee would bear a substantial relationship to its purpose. In evaluating the relationship of PIA's activities to its purposes as a business league, the capacity in which benefits are received by the organization's members is as important as the unique character of the organization's activities. For a substantial relationship to exist, any direct benefits flowing from a business league's activities must inure to its members in their capacities as members of the organization. Thus, where

a business league's uniquely relevant activities produce inherently group benefits that accrue to its members qua members, a substantial relationship exists within the meaning of Section 513. *Louisiana Credit Union League v. United States,* 693 F.2d 525, 536 (5th Cir.1982).

■ Only those activities that benefit the independent insurance agents in their capacities as regular members of PIA can be substantially related to PIA's exempt function. This group benefit standard also accords with the requirement that a business league seek to improve the conditions of an entire line of business rather than perform discrete services for individuals. When the activities of a business league are directed toward the achievement of the common business interest of its members, the benefits that accrue to its members are inherently group benefits. A product or service that seeks to accomplish a truly tax exempt purpose does not assure the member that he will receive benefits directly proportional to the fees he pays. For instance, a portion of PIA's membership dues might have been used to sponsor lobbying efforts for legislation favorable to small insurance agencies. The benefits PIA's members might have received from such activities could have been negligible or far more valuable than the amount of their dues. A similar point can be made regarding educational seminars. A member attending PIA-sponsored seminars might receive far more or less than he paid for. The insurance at issue here, however, was strictly a quid pro quo proposition. A member received a benefit exactly proportional to the premium he paid. Services which render benefits according to the fee that is paid for them are taxable business activities, not tax exempt services. Were we to adopt another rule people would attempt to market all services and products under the aegis of a tax exempt organization.

Therefore, the activities that serve the interests of individual insurance agents according to what they pay produce individual benefits insufficient to fulfill the substantial relationship test, since those activities generally do not generate inherent group benefits that inure to the advantage of its members as members.

Since PIA's insurance premium benefits are basically a fund raising activity, it is by definition unrelated business activity under Section 513(a). It is not the sort of unique activity that satisfies the substantial relationship test, nor are its benefits inherently group related. Advising its members of the availability and desirability of insurance coverage does not fall within that category. We feel that PIA's endorsement of the insurance programs and the promotion thereof are not substantially related to its exempt functions. *See, Louisiana Credit Union League v. United States, supra.* In effect, whether a trade or business is substantially related to an exempt function of a tax exempt business requires an examination and a comparison of the services it renders and the purposes as set forth in its organizational charter. In this case, an examination of the activities reflects that as to its insurance premiums, PIA's purpose is entirely revenue raising. Such a financial relationship is by definition not substantially related to its tax exempt purposes.

CORNELIA G. KENNEDY, Circuit Judge, concurring in part and dissenting in part.

Because I believe that PIA's activities concerning the E & O insurance were substantially related to PIA's exempt purposes, I dissent from that portion of the majority opinion holding the revenue from the E & O insurance plan taxable.

The majority adopts the requirement that "[f]or a substantial relationship to exist, any direct benefits flowing from a business league's activities must inure to its members in their capacities as members of the organization." Majority opinion, *supra,* at 1103. This requirement was established in the Fifth Circuit in *Louisiana Credit Union League v. United States,* 693 F.2d 525 (5th Cir.1982). The capacity in which members receive benefits from an activity should be a factor to be considered in determining whether the activity is substantially related

to the organization's exempt functions. However, I see no justification for requiring members to receive benefits *only* in their capacity as members.[1] PIA's exempt function is to promote one industry—the independent agency system of selling insurance. The statutory requirement of a substantial relationship to an exempt purpose could thus be satisfied by any activity that substantially benefits the industry as a whole. This would include not only activities such as lobbying and advertising, which benefit members solely in their capacity as industry members,[2] but also activities which directly benefit some members in their capacity as members. The majority's test therefore asks the wrong question: instead of measuring individual benefits, and taxing activities that produce any, we should be measuring benefits to the industry and taxing activities that produce none that are substantial.

A broader, less rigid approach was recently used by the Fourth Circuit in *Carolinas Farm & Power Equipment Dealers Ass'n v. United States*, 699 F.2d 167 (4th Cir.1983). That case presented the question of whether income derived from life and health insurance plans sponsored by an association of independent retail farm and power equipment dealers was substantially related to the organization's exempt function. The court noted that:

> it is often difficult to determine whether a trade association's activities primarily benefit individual members or the trade generally since the interests of both are inevitably intertwined. In this case, for example, the provision of low-cost life insurance most directly benefits those members of the Association who choose to participate in the program, but it can also be said to benefit the entire industry—at least that operating in North and South Carolina—since it makes available

to all the option to join in such a program.

699 F.2d at 171. The court then considered three factors as evidence that the plans benefited primarily individual members and not the industry as a whole: (1) the fees charged members were in direct proportion to the benefits received; (2) participation was limited to the organization's members and the program was of no benefit to those in the industry who were not members; and (3) the service provided was otherwise generally available in the marketplace. Examination of the E & O insurance plan at issue reveals that none of these factors is present.

First, the availability and widespread acceptance of E & O insurance provides certain benefits to all members of the industry whether or not claims are paid on behalf of all members. If this form of malpractice insurance were unavailable, small independent agencies would be vulnerable to errors resulting in lawsuits that could put a small agency out of business. Thus, it would be difficult to get responsible persons to operate independent agencies. Making such insurance available promotes public confidence in the independent agency system by increasing stability, accountability for errors, and the integrity of the industry. Improving public confidence benefits an industry in the same way as does advertising. This benefit is received equally by all members, since the public is probably not aware of which agencies have the insurance, and therefore it is not conferred only in direct proportion to the fees paid by members. The competition of independent agencies are large insurance companies that sell through their own employees. They are perceived as being financially sound. To compete, independent agents must promote the same image.

Second, the program's benefits are not restricted to PIA members. The E & O

---

**1.** The *Louisiana Credit Union League* court cited no authority to support imposing this requirement.

**2.** A strict construction of the majority's test, which requires all direct benefits to be received

in the capacity of members of the organization, would tax even advertising and lobbying activities; these activities normally benefit members in their capacity as members of the *industry,* rather than as members of the organization.

insurance is also available to nonmember agents. It is also worth noting that the 75 to 80 percent of PIA's membership who subscribe to the E & O insurance represent a significant segment of the industry. Participation could not be increased to 100% without endangering one of the program's benefits; if PIA were somehow able to obtain uniform automatic E & O coverage for all its members, the insurance carrier would not provide an incentive for good insurance practices by refusing to insure agencies that were poor risks, and the public protection benefit would be decreased rather than increased.

Third, E & O insurance is not easily available to independent agencies from other sources.[3] The congressional purpose to prevent exempt organizations from enjoying an unfair advantage over competing nonexempt businesses is therefore not endangered. *See Louisiana Credit Union League v. United States,* 693 F.2d 525, 539–40 nn. 27–29 (5th Cir.1982) and legislative history cited therein.

The availability of E & O insurance is related to the association's exempt purpose in exactly the same way as would be an educational seminar program. Members who chose to participate in an educational seminar would receive direct benefits by increasing their knowledge and expertise, which would presumably help their individual businesses. Such benefits might only be available to those members willing to pay a fee for the seminar. The entire industry, however, would be benefited by the availability of programs that enrich the knowledge of its members. The same is true for the availability of E & O insurance.

The income PIA gained from the E & O insurance plan is therefore substantially related to PIA's exempt purposes, and not unrelated business taxable income. I would therefore reverse the Tax Court with respect to the E & O income and remand for recalculation of PIA's liability. I do, however, concur with the majority that PIA's

other insurance-related income is unrelated business taxable income.

Accordingly, I dissent in part and concur in part.

---

**3.** *See Oklahoma Cattlemen's Ass'n v. United States,* 310 F.Supp. 320 (W.D.Okl.1969) (health and life insurance plans substantially related to

exempt function since self-employed members have no other opportunity to participate in group plans).