**ILLINOIS ASSOCIATION OF PROFESSIONAL INSURANCE AGENTS, INC., Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 85–2423.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 18, 1986.

Decided Sept. 25, 1986.

---

David I. Pincus, Dept. of Justice, Tax Div., Washington, D.C., for respondent-appellee.

Before COFFEY and RIPPLE, Circuit Judges, and WILL, Senior District Judge.[*]

WILL, Senior District Judge.

The tax court found[1] that the Illinois Association of Professional Insurance Agents, Inc. (IAPIA or Association), a tax-exempt business league, was subject to the tax on unrelated business income on the fees it received in 1976 and 1977 for performing promotional and administrative services in connection with the sale of errors and omissions insurance to its members. We affirm for the reasons stated in this opinion.

## I

The Association is exempt from federal taxation under section 501(c)(6) of the Internal Revenue Code which provides an exemption for "[b]usiness leagues ... not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual." 26 U.S.C. § 501(c)(6). However, "[a] tax-exempt organization must pay tax on income that it earns by [regularly] carrying on a [trade or] business not 'substantially related' to the purposes for which the organization has received its exemption from federal taxation." *United States v. American College of Physicians,* — U.S. —, 106 S.Ct. 1591, 1600, 89 L.Ed.2d 841 (1986); *United States v. American Bar Endowment,* — U.S. —, 106 S.Ct. 2426, 2430, 91 L.Ed.2d 89 (1986); 26 U.S.C. § 511(a).

■ Amounts received by a tax-exempt organization from its insurance programs constitute "unrelated business taxable income," if the activity "(1) constitutes a trade or business; (2) is regularly carried on; and (3) is not substantially related to [the organization's] tax-exempt purposes" (other than through the production of

William S. Hanley, Sorling, Northrup, Hanna, Cullen & Cochran, Springfield, Ill., for petitioner-appellant.

---

[*] The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. The tax court's opinion is unofficially reported at 49 TCM (CCH) 925 (1985).

funds). *American Bar Endowment,* 106 S.Ct. at 2430; 26 C.F.R. 1.513–1(a); 26 U.S.C. §§ 512(a) & 513(a). The Association contends that the fees it received in connection with the sale of errors and omissions insurance do not constitute unrelated business income and are not taxable, first, because its activities do not constitute a "trade or business". Second, if its activities do constitute a trade or business, though the Association admits the activities were carried on regularly, it claims that the errors and omissions insurance business is substantially related to its exempt purposes.

We must determine whether the tax court erred in deciding that the Association's errors and omissions insurance activities constituted a trade or business and that those activities were not substantially related to its exempt purpose.

## II

### Factual Background

The evidence before the tax court consisted of the stipulations of the parties and the testimony of Harold S. Price, the executive director of the IAPIA during 1976 and 1977. During those years, IAPIA had about 900 members, all independent insurance agents, most of whom ran one or two person insurance agencies in small communities.

The objectives of the Association, as stated in its bylaws are

to maintain and extend the American Agency System; to promote the equitable rights of its members; to provide its members with an increased knowledge of insurance underwriting and selling, loss prevention, and agency operation; to foster a high standard of insurance ethics and promote friendship in the insurance business; and to do all things to the end that its members may better

serve the public, their companies and themselves.

(A—41–42).

IAPIA made a number of insurance programs available to its members through the National Association of Professional Insurance Agents (National Association) with which IAPIA is affiliated as a state association. "Errors and Omissions (E & O) insurance is a type of professional malpractice insurance which protects the insurance agent from liability in the event his client suffers a loss as a result of errors made in writing a policy." *Professional Insurance Agents of Michigan v. C.I.R.,* 726 F.2d 1097, 1099 (6th Cir.1984) (*PIA of Michigan*). Harold Price, IAPIA's executive director, testified that in the early 1960s, errors and omissions insurance was not widely available and was not consistently offered to independent insurance agents. In order to increase the availability and to maintain continuity of such coverage, the National Association sponsored an errors and omissions insurance program underwritten by a group of underwriters, but issuing individual policies to insurance agents. According to Price, in later years, including the years in question here, errors and omissions insurance was available from other sources. The National Association received a percentage of the premiums as a service fee from the insurance companies offering the various plans. A portion of those fees was distributed to the state association, including IAPIA, for services rendered by them on behalf of the National Association. Only the fees earned by IAPIA for its activities in support of the errors and omissions insurance program are at issue in this case,[2] the Association having agreed that fees derived from the performance of services on other insurance programs are unrelated business taxable income not substantially related to its exempt purposes.

The tax court found that IAPIA performed the following services in connection

---

**2.** IAPIA received from the National Association $16,777.92 in 1976 and $21,756.85 in 1977 for its services on the errors and omissions insurance program. (A—7). Citations to the Appendix filed with petitioner's brief are noted by (A—pg. #), and citations to the transcript of trial are noted by (Tr.—pg. #).

with the errors and omissions insurance program:

(a) listing of the program in [its] literature, including its membership applications and monthly publication;

(b) maintaining application forms and rate schedules at its office;

(c) responding to inquiries [from agents] requesting applications, mailing applications to requesting parties, reviewing applications sent to [IAPIA] by individuals purchasing the insurance, and forwarding them to the National Association; and

(d) informing members of the general need for E & O insurance through its publications.

(A—43–44).

## III

### Trade or Business

In deciding whether income producing activities of a tax-exempt organization constitute a trade or business, some courts use a profit motive test, focusing on whether the activity "is carried on for the production of income from the sale of goods or the performance of services", 26 U.S.C. § 513(c), other courts use an unfair competition test, focusing either on whether the tax-exempt organization enjoys an unfair competitive advantage over tax-paying entities engaged in similar activities or on whether the activity is conducted in a competitive, commercial manner. Under either test, IAPIA's errors and omissions insurance activities constitute the conduct of a trade or business. Though these two lines of cases can be reconciled (*see infra* note 4), the Supreme Court recently clarified the proper approach to be used in determining whether income-producing activities of a tax-exempt organization constitute a trade or business for purposes of the tax on unrelated business income. *United States*

*v. American Bar Endowment,* — U.S. —, 106 S.Ct. 2426, 91 L.Ed.2d 89 (1986).

The American Bar Endowment (ABE) is a charitable organization which "raises money for its charitable work by providing group insurance policies, underwritten by major insurance companies, to its members." *Id.* 106 S.Ct. at 2428. The ABE requires, as a condition of participating in the insurance programs, that members assign the dividends (the difference between the actual cost of providing the insurance and the premiums paid) to the ABE. The "ABE's insurance program has provided $81.9 million in dividends in its 28 years of operation". *Id.* at 2431. The endowment chooses the insurers, negotiates the premium rates, "compiles a list of its own members and solicits them, collects premiums paid by its members, transmits those premiums to the insurer, maintains files on each policyholder, answers members questions concerning insurance policies and screens claims for benefits." *Id.* at 2429.

The Supreme Court found that the ABE's insurance program constituted a trade or business for purposes of the tax on unrelated business income. The Court pointed out that "Congress defined a 'trade or business' as 'any activity which is carried on for the production of income from the sale of goods or the performance of services.' § 513(c)." *Id.* at 2430. That definition is further clarified in the regulations, which provide that "in general, any activity of [an exempt] organization which is carried on for the production of income and which otherwise possesses the characteristics required to constitute 'trade or business' within the meaning of section 162" is a trade or business for purposes of the tax on unrelated business income. 26 C.F.R. § 1.513(b).[3] The Court then notes that:

---

3. Section 1.513(b) provides:

The primary objective of adoption of the unrelated business income tax was to eliminate a source of unfair competition by placing the unrelated business activities of certain exempt organizations upon the same tax basis as the nonexempt business endeavors with which

they compete. On the other hand, where an activity does not possess the characteristics of a trade or business ..., such as when an organization sends out low cost articles incidental to the solicitation of charitable contributions, the unrelated business income tax does not apply since the organization is not in

The standard test for the existence of a trade or business for purposes of § 162 is whether the activity "was entered into with the dominant hope and intent of realizing a profit." ... Thus several Courts of Appeals have adopted the "profit motive" test to determine whether an activity constitutes a trade or business for purposes of the unrelated business income tax. *See Professional Insurance Agents of Michigan v. Commissioner,* 726 F.2d 1097 (6th Cir.1984); *Carolinas Farm & Power Equipment Dealers v. United States,* 699 F.2d 167 (4th Cir.1983); *Louisiana Credit Union League v. United States,* 693 F.2d 525 (5th Cir.1982).

*American Bar Endowment,* 106 S.Ct. at 2430 n. 1.

Courts using the profit motive test rely on the plain language of section 513(c) and the legislative history. The Fifth Circuit found that Congress had multiple purposes in passing the tax. Though the primary purpose of the tax on unrelated business income is to eliminate the unfair competitive advantage tax-exempt organizations have over tax-paying entities, Congress also intended to raise revenues. *Louisiana Credit Union League,* 693 F.2d at

538–42. Congress chose to deal with the problem of unfair competition in a broad manner which was easy to administer by taxing "*any* activity [that is not specifically exempted from the tax] which is carried on for the production of income from the sale of goods or the performance of services." *Clarence LaBelle Post No. 217, Veterans of Foreign Wars of United States v. United States,* 580 F.2d 270, 272–75 (8th Cir.) (majority opinion), *cert. dismissed,* 439 U.S. 1040, 99 S.Ct. 712, 58 L.Ed.2d 716 (1978), *superceded by statute/rule as stated in Louisiana Credit Union League,* 693 F.2d 525, 541 & n. 33; *Cf. LaBelle,* 580 F.2d at 275–81 (Schatz, J., dissenting).[4]

In *American Bar Endowment,* the Court found that ABE's insurance falls within the literal language of the statutory definitions as "both 'the sale of goods' and 'the performance of services,' and possesses the general characteristics of a trade or business." 106 S.Ct. at 2430. The Court focused on whether the activities were the kind of activities that are "provided by private commercial entities in order to make a profit" and on whether the tax-exempt organization earned substantial income from its program. *Id.*[5] The Court

competition with taxable organizations. However, in general, any activity of a [tax exempt] organization which is carried on for the production of income and which otherwise possesses the characteristics required to constitute "trade or business" within the meaning of section 162—and which, in addition, is not substantially related to the performance of exempt functions—presents sufficient likelihood of unfair competition to be within the policy of the tax....

4. Courts utilizing the unfair competition test [*Disabled American Veterans v. United States,* 650 F.2d 1178, 227 Ct.Cl. 474 (1981); *Hope School v. United States,* 612 F.2d 298 (7th Cir. 1980); *Carle Foundation v. United States,* 611 F.2d 1192 (7th Cir.1979)] cite the legislative history of the Act for the proposition that Congress' primary purpose in imposing the tax on unrelated business income was to eliminate unfair competition. Proponents of the profit motive test, however, claim that profit motive is sufficient indication of a "business" if the activity is not substantially related to exempt purposes, relying on the "conclusive presumption" created in section 1.513(b) of the regulations. That section provides that, in general, any activ-

ity of [an exempt] organization which is carried on for the production of income and which otherwise possesses the characteristics required to constitute "trade or business" within the meaning of section 162—and which, in addition, is not substantially related to the performance of exempt functions—presents sufficient likelihood of unfair competition to be within the policy of the tax.

26 C.F.R. § 1.513(b).

Read carefully, the two lines of cases are not in conflict. No court has yet created a general exception to the unrelated business income tax based solely on a showing that the tax-exempt organization did not compete, or threaten to compete unfairly with tax-paying entities. Rather, the cases hold that activities engaged in for the production of income do not constitute a "trade or business" within the meaning of section 513(c) where the income is derived from charitable contributions rather than from the sale of goods or the performance of a service.

5. Though garnering substantial profits is indicative of a profit motive, an organization need not generate profits from an activity for that activity to be a trade or business. Section 513(c) of the Internal Revenue Code provides:

then pointed out that the assignment of dividends by ABE members could not be equated unequivocally with a donative, charitable, intent. Finally, the Court found that the ABE's insurance program presented the potential for unfair competition because, as a tax-exempt organization, ABE could perform the insurance services and sell the insurance at a lower cost than a tax-paying entity.

The tax court here found that IAPIA had the intent to make a profit from its activities in support of the National Association's errors and omissions insurance program, and that its promotion of the program to its members "in preference to the other available plans could work to the disadvantage of the competitors of the National Association's Errors and Omissions program." (A—45). The tax court did not rely on this second finding for its holding that IAPIA's errors and omissions insurance program is a trade or business. (A—46). However, neither finding is clearly erroneous. There is, therefore, ample support for the court's finding that the Association's errors and omissions insurance activities constitute a trade or business for unrelated business income tax purposes.

IAPIA first contends that its activities are not a trade or business because it had no intent to make a profit. The tax court's finding that IAPIA had the intent to make a profit is not clearly erroneous, and, in fact is more than amply supported by the record. IAPIA executive director Price's self-serving testimony to the contrary was discounted by the tax court. Though Price denied an intent to make a profit (Tr.—29), he admitted that if the carrier had reduced amounts paid to his organization that he "might have suggested to the National that maybe they weren't doing a good job." (Tr.—24). In addition, the record reflects that IAPIA made substantial profits from its errors and omissions insurance activi-

ties, reaping profits about three times greater than its related expenses for all insurance activities in each year. (A—7, 26). Finally, the services performed by IAPIA, and the insurance sold through its efforts are the kind of services performed, and insurance sold, by private commercial entities in order to make a profit. Though IAPIA's activities were not as extensive as those of ABE (nor were its profits as great), they were commercial services which were necessary in order to market and sell the insurance.

Likewise, the tax court did not clearly err in finding that IAPIA's errors and omissions insurance activities could work to the disadvantage of competitors. IAPIA acted as a middleman, performing marketing, advertising, and administrative functions which any competitor of National's errors and omissions insurance program would have had to perform itself, or pay a non-exempt organization to perform. Such competitors (which, according to Price, existed during the years in question) are at a disadvantage because the National program received these essential services from a tax-exempt organization, which could presumably perform the services at a cheaper rate than a tax-paying entity.

IAPIA's errors and omissions insurance activities constitute the conduct of a business for the purposes of the tax on unrelated business income. It intended to profit from its E & O insurance activities, and performed services which a tax-paying organization could have performed. Thus, IAPIA, as a tax-exempt organization has an unfair competitive advantage over tax-paying entities unless it pays the unrelated business income tax on its income from E & O insurance activities. In addition, as the court in *Carolinas Farm* noted, where an activity is not substantially related to exempt purposes, is "conducted in a competitive profit seeking manner, and regularly earns significant profits, a heavy burden must be placed on the organization to

---

the term "trade or business" includes any activity which is carried on for the production of income from the sale of goods or the performance of services ... [even if] it is carried on within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization ... [and even if] it does not result in a profit.

prove profit is not its motive" for engaging in the activity. *Carolinas Farm & Power Equipment Dealers Ass'n, Inc. v. United States,* 699 F.2d 167, 171 (4th Cir.1983).

## IV

### Business Not Substantially Related To Exempt Purposes

■ "Unrelated trade or business" is defined in section 513 as "any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance" by the organization of its exempt function. 26 U.S.C. § 513(a). Judge Goffee found that IAPIA's errors and omissions insurance activities were not substantially related to the accomplishment of its exempt purposes. Those activities

> simply generate revenue for the association and provide members with a convenient and economical service in the operation of their agencies, rather than contributing directly and importantly to the improvement of conditions in a particular line of business.... The benefits of such insurance inure to each agent in direct correlation with his participation and his payment of premiums. Petitioners have failed to show any direct benefit to the common interests of its members.

(A—46–48).

To determine whether the Association's E & O business is substantially related to its exempt purposes, other than through the production of funds, we must examine "the relationship between the business activities which generate the particular income in question—the activities, that is, of ... performing the services involved—and the accomplishment of the organization's exempt purposes." 26 C.F.R. § 1.513–1(d)(1). The conduct of the business activities must have a substantial causal relationship to the achievement of exempt purposes, other than through the production of income. 26 C.F.R. § 1.513–1(d)(2). That is, "the performance of the services from which the gross income is derived must contribute importantly to the accomplish-

ment of those [exempt] purposes." *Id.* "In determining whether the activity contributes importantly to the accomplishment of an exempt purpose, the size and extent of the activities involved must be considered in relation to the nature and extent of the exempt function which they purport to serve." 26 C.F.R. § 1.513–1(d)(3).

The exempt purpose of a business league is to promote some common business interest, "not to engage in a regular business of a kind ordinarily carried on for profit." 26 C.F.R. § 1.501(c)(6)–1. Exempt activities "should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons." *Id.* Other courts have taken this to mean that the activities which generate the income must benefit the members "as a group, rather than in their individual capacity." *PIA of Michigan,* 726 F.2d at 1103; *Carolinas Farm,* 699 F.2d at 171; *Louisiana Credit Union League v. United States,* 693 F.2d 525, 535 (5th Cir.1982); *Steamship Trade Association of Baltimore v. C.I.R.,* 757 F.2d 1494, 1497–98 (4th Cir.1985); *but see* dissenting opinion in *PIA of Michigan,* 726 F.2d at 1104–1105 (no justification for requiring members to receive benefits only in their capacity as members). The Fourth Circuit has identified three factors relevant in determining whether a substantial causal relationship exists between the organization's income producing activities and its exempt purposes:

> (1) whether fees charged are directly proportionate to benefits received; (2) whether participation is limited to members and thus is of no benefit to those in the industry who are non-members; and (3) whether the service provided is one commonly furnished by for-profit entities.

*Steamship Trade Ass'n,* 757 F.2d at 1498, *citing, Carolinas Farm,* 699 F.2d at 171.

It is well settled that, ordinarily, income which a business league derives from the sale of insurance to its members is not

derived from a business which is substantially related to the accomplishment of its exempt purposes. *PIA of Michigan,* 726 F.2d at 1104; *Carolinas Farm,* 699 F.2d at 171; *Louisiana Credit Union League,* 693 F.2d at 536–37. The Association agrees as to its other group insurance programs, but contends that the unique nature of the errors and omissions insurance program is substantially related to its exempt purposes. Agents are benefitted by the errors and omissions insurance coverage only if they buy it, and their coverage is in proportion to their individual risk factors and the amount they are willing to pay. Thus, providing such insurance coverage benefitted the individuals, rather than contributing importantly to improving conditions in a particular line of business. Though the program is not limited solely to members of the Association, apparently, only members purchased the insurance during the years in question. Thus, there was no direct benefit to the common interests of its members or the industry generally. Finally, the sale of malpractice insurance is a business ordinarily carried on by for-profit organizations. Such insurance was available from other sources, presumably provided by tax-paying entities. Where services and goods are available in the marketplace, "a trade association need not provide it to accomplish an exempt purpose." *Carolinas Farm,* 699 F.2d at 172.

In determining whether the business of selling advertising space in a tax-exempt organization's journal is substantially related, or contributes importantly, to the organization's exempt (educational) purpose, the Supreme Court recently held that the proper inquiry is whether the publishers "performed the advertising services in a manner that evinces an intention to use the advertisements for the purpose of contributing to the educational value of the journal," rather than upon the educational quality of the advertisements. *American College of Physicians,* — U.S. —, 106 S.Ct. 1591, 1599, 89 L.Ed.2d 841. The Court points out that "the statute provides that a tax will be imposed on 'any trade or business the *conduct* of which is not sub-

stantially related' [to the organization's exempt purposes], 26 U.S.C. § 513(a), directing our focus to the manner in which the tax-exempt organization operates its business." *Id.* 106 S.Ct. at 1599–1600.

We must ask: Do IAPIA's activities in promoting errors and omissions insurance coverage among independent insurance agents evince an intention to use that promotion of E & O coverage for the purpose of contributing importantly to the improvement of conditions in a particular line of business, or do its activities in promoting coverage indicate that any exempt function which is served is incidental to its purpose of raising revenue? In other words: Did the Association conduct its errors and omissions insurance business in a manner which was intended to further its exempt purposes, or did it conduct its business in a manner which indicates that raising revenue was the primary concern?

The Association claims that its objectives were "primarily service and education to the 900 small town independent agents that were its members and to the public whom they served." IAPIA claims that its E & O insurance activities served its exempt purposes by (1) educating its members on loss prevention; (2) providing secondary coverage to the public whose insurable losses would not otherwise be paid due to an agent's neglect; and (3) promoting "public confidence in the independent agency system by increasing stability, accountability for errors, and the integrity of the industry." *Quoting PIA of Michigan,* 726 F.2d at 1105 (Kennedy, J., dissenting).

Publishing articles on loss prevention and the desirability of errors and omissions insurance coverage would be substantially related to the accomplishment of IAPIA's goal of educating agents on loss prevention. Malpractice insurance, in theory, is in the public interest, but its primary purpose is to protect and defend agents from claims made by the public against them. And, encouraging the use of professional liability insurance, or even assuring its availability were it not available, could be substantially related to the exempt purpose of im-

proving conditions in the industry generally by providing otherwise unavailable coverage and thereby increasing public confidence in the independent agency system of selling insurance. However, the manner in which IAPIA conducted its errors and omissions insurance activities indicates that the tax court's determination was correct.

Price testified that the main objective was to inform agents of the necessity for carrying E & O insurance, and that they "didn't pretend to tell them where to get it." (Tr.—66). He also testified that IAPIA's publications were written in such a way that they benefitted all E & O carriers, not just National's. However, IAPIA did not merely inform its members of the general need for E & O coverage through its publications. Nor did it provide coverage where none was available in the market, at least during the years in question here.[6] Rather, IAPIA endorsed a particular E & O program in a manner which provided convenient marketing, advertising, and administrative services to the offering insurance company, generated income for the Association, and provided its individual members convenient coverage.

The advertisement published five times in IAPIA's monthly publication during 1976 and 1977 gave 14 reasons why IAPIA's program was "better" than all others, and emphasized defense against claims (and that an agent's defense costs were not subject to the deductible), rather than providing secondary coverage for the public by purchasing E & O insurance. This is not merely educating agents about loss prevention, nor is it primarily to serve the public

interest. Likewise, the four articles on professional liability insurance did not merely compare and contrast the available E & O programs or merely advise of the need for such coverage, which would be substantially related to IAPIA's exempt function. Rather, the articles are little more than advertisements or non-subtle "plugs" for the National E & O program.[7]

In addition, the Association performed a number of other marketing and administrative services on behalf of National's E & O program. It provided its members with information and applications for National's E & O program, answered questions about the program, and checked completed applications and forwarded them to National. Since E & O coverage was available from other sources, these activities were not necessary in order for IAPIA to accomplish its exempt purposes. This is especially evident in light of the fact that the "educational" and "informative" materials IAPIA did publish were focused on pushing one program, not at informing members of the need for, and availability of E & O coverage generally. In short, IAPIA conducted its activities as a for-profit entity would, with a view towards maximizing its profits, not towards merely informing members of the necessity for such insurance, or providing an independent evaluation of the various programs. Any exempt function IAPIA's E & O program may have served was incidental to its purpose of raising revenues.

We conclude that the tax court correctly determined that IAPIA's E & O activities

---

6. The only evidence on the availability of other E & O insurance plans is the testimony of price. It is clear from his testimony that competitors did exist during the years in question. He did not believe that National's program was the least expensive. (Tr.—74). He also speculated that it was possible that a competitor would drop such coverage if it was losing money. (Tr. —73). There is no evidence that competitors were losing money, and no evidence about the nature of the competitors' programs. There is no evidence that they were less stable, or that they would or would not be around on a continuous basis.

7. In two of the four articles, National's E & O program is described by Price in glowing terms as "the best possible program for the lowest possible cost for the average independent agent" (A—32); "the longest continuous program" with "the largest number of participants" and "with excellent technical and financial advice" (A—34). A third article merely informs "*our* policy holders" about the type of coverage chosen, claims made, and changes in the Association's coverage. (A.—36). The fourth mentions the E & O program available through the Association, and then goes on to describe areas in which the greatest number of claims have been filed under that program. (A—37).

did not contribute importantly to improving conditions in a line of business or the industry generally, and are not substantially related to accomplishing any of its exempt purposes. Support for this conclusion can be found in Fifth and Sixth Circuit cases which are directly in point. In a Fifth Circuit case, a credit union league argued "that by encouraging the use and purchase of insurance by credit unions [insuring depositors' funds from loss], it strengthens the credit union movement by reducing the likelihood of credit union failure from unforeseen events." *Louisiana Credit Union League*, 693 F.2d at 536. Similarly, IAPIA argues that encouraging the use and purchase of E & O insurance by independent agents increases public confidence in the independent agency system of selling insurance by reducing the likelihood that purchasers of insurance will suffer a loss due to an agent's negligence. The Fifth Circuit agreed with the trial court that "the connection between the furtherance of the credit league movement and the selling of insurance is at best tangential ... [because] [i]nsurance endorsement and administration is not the sort of unique activity that satisfies the substantial relationship test, nor are its benefits inherently group related. Rather than merely advising its members of the availability and desirability of insurance coverage to credit unions generally, [the league] promoted the purchase of policies from a particular carrier." *Id.* Likewise, IAPIA's insurance activities did little more than generate revenues for the Association and provide the particular insurance carrier with convenient services in marketing and administering its program.

In a Sixth Circuit case involving the same E & O insurance program from the same National Association, the court found that promotion of the insurance was not directed toward achieving common business interests of its members in a line or lines of business, rather it benefitted the individuals in direct proportion to the fees they paid. *PIA of Michigan*, 726 F.2d at 1104. The Association relies on the dissent in *PIA*, but even under that rationale, which is based on the analysis in *Carolinas*

*Farm*, IAPIA's activities are not substantially related to its exempt function. Judge Kennedy stated in dissent that widespread availability of E & O insurance promotes public confidence, benefitting the industry in general, thus the benefit is not conferred in proportion to the amount each agent pays for the insurance. This tangential benefit, does not, we believe, contribute importantly to the organization's exempt purposes. *See Louisiana Credit Union League*, 693 F.2d at 536–37. Next, Judge Kennedy argued that the insurance was available to all in the industry, and was not otherwise easily available. In both cases, the primary benefits were received by individuals in direct proportion to the fees charged. In this case, the record indicates that the insurance was, in theory, available to non-members, but participation was limited, in fact, to members. More importantly, E & O insurance was otherwise generally available in the marketplace according to Price. If the years in question were the "early years" Price spoke of at trial, when no other E & O coverage was available, this might be a different case. However, based on the record, given the availability of coverage from other sources, IAPIA's activities in marketing a particular E & O program to its members did not contribute importantly to the accomplishment of any of its exempt purposes.

### Conclusion

The Association's errors and omissions insurance activities were carried on for the production of income from the sale of goods and the performance of services. Such activities constitute a "trade or business" for purposes of the tax on unrelated business income. Those activities were in competition with services provided by other taxpaying entities. The activities were directed toward marketing a particular E & O program from which the Association derived substantial profits, rather than aimed at improving common business conditions for all independent insurance agents. The benefits of the program were received by individual agents in proportion to the amount they paid, rather than as a benefit to the group, and the Association conducted its activities in a manner intended to

increase profits rather than in a manner intended to accomplish its exempt purposes. Thus, the business of marketing E & O insurance is not substantially related, in a causal manner, to the accomplishment of the Association's exempt purposes. For these reasons, the decision of the tax court is

AFFIRMED.

RIPPLE, Circuit Judge, dissenting.

I am in substantial agreement with the views of Judge Kennedy which are set forth in her dissenting opinion in *Professional Insurance Agents of Michigan v. Commissioner*, 726 F.2d 1097, 1104–06 (6th Cir.1984). As I read the record in this case, while E & O coverage was available from other parties during this period, it was still a difficult coverage to obtain and there was a good deal of instability in the market. Carriers often discontinued or altered their coverage and there was a substantial risk that the individual independent agent would find himself without coverage. The Association's plan provided stability and assured continuity of coverage. The individual agent, the industry and the public benefited. Thus, the program was substantially related to the Association's exempt purposes.