**NATIONAL ASSOCIATION OF POSTAL SUPERVISORS, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 99–89 T.**

United States Claims Court.

Aug. 14, 1990.

J. Kirk Wade, Washington, D.C., for plaintiff.

Benjamin King, Washington, D.C., with whom was Shirley D. Peterson, Asst. Atty. Gen., for defendant.

## OPINION

RADER, Judge.

Plaintiff, National Association of Postal Supervisors (NAPS or Association), is a tax-exempt labor organization that sponsors a health plan under the Federal Employees Health Benefits Program (FEHBP). In 1980, NAPS opened its plan to non-postal federal employees. NAPS required these new plan enrollees to join the labor organization as limited benefit members. Limited benefit members paid $25.00 in annual dues.

The Internal Revenue Service (IRS) determined that NAPS's collection of membership dues in return for health insurance

was a trade or business activity unrelated to the organization's tax-exempt purpose. As a consequence, these dues generated taxable income in the 1983 and 1984 tax years. IRS determined that NAPS owed $696,369.59 in additional tax and interest. NAPS seeks a refund for payment of this tax.

After a trial on July 18 and 20, 1990, this court determines that NAPS may not recover a refund. Collecting membership dues from health plan enrollees was a regularly conducted business activity unrelated to NAPS's tax-exempt purpose.

## FACTS

### National Association of Postal Supervisors

Since 1908, NAPS has been an unincorporated association. Stipulation, filed July 6, 1990 (Stip.), at ¶ 5; Transcript of Proceedings, No. 99–89T, filed July 26, 1990 (Tr.), at 70–71. As a labor organization, NAPS is exempt from federal income taxation under 26 U.S.C. § 501(c)(5) (1988). To obtain this exemption, NAPS filed an affidavit with the IRS in 1949. Stip., at ¶ 7; Defendant's Exhibits, No. 99–89T, filed July 26, 1990 (Def.Ex.), 2. The affidavit stated that NAPS's purpose was the "social and economic advancement of postal supervisors and improvement of the postal service." Def.Ex. 2. The affidavit further stated that NAPS attempted to "secure the enactment of legislation in the interest of postal supervisors." Def.Ex. 2.

From 1958 to 1976, NAPS offered two classes of membership—active and honorary. Stip., at ¶ 8; see Tr., at 132. Postal supervisors qualified as active members. Active members could hold office, vote, participate on committees, and serve as delegates to NAPS conventions. Retired postal supervisors qualified as honorary members. While honorary members could attend NAPS meetings and conventions, they had no right to vote.

In 1976, NAPS created a new class of "associate" membership. Stip., at ¶ 9. Postal supervisors in good standing at the time of retirement qualified for associate membership. Under this membership category, retired postal supervisors could serve on committees and in consultative capacities. Associate members could not vote at NAPS functions.

In 1980, NAPS amended its constitution and bylaws to provide a fourth class of "limited benefit" membership. Stip., at ¶ 10; Def.Ex. 4; Tr., at 160. In the years at issue, non-postal federal employees became limited benefit members, but only "for the sole purpose" of obtaining insurance under the Postal Supervisors Health Benefits Plan (NAPS Health Plan). Stip., at ¶ 10; Def.Ex. 4 (1980 NAPS Constitution); Tr., at 101–02. Limited benefit members could not vote or hold office. See Tr., at 161–62.

To become an active or associate member, individuals submit an application to NAPS's state, local, or district branch. To become a limited benefit member, however, the non-postal federal employees must first submit to the Office of Personnel Management (OPM) an application for enrollment into the NAPS Health Plan. NAPS adds these employees to the list of enrollees in the health plan and subsequently sends them a $25.00 invoice for limited benefit member dues. See Tr., at 140. After these employees pay the $25.00, NAPS adds them to the list of limited benefit members. If they do not pay the membership dues, NAPS cancels their enrollment in the health plan.

From 1981 through 1984, NAPS experienced a substantial increase in limited benefit membership. On July 1, 1981, only 149 limited benefit members enrolled in NAPS. Only 215 additional limited benefit members enrolled through June 1982. However, by July 1, 1983, limited benefit membership skyrocketed to over 23,000 people. This pattern continued through July 1984, when limited benefit membership reached almost 33,000 federal employees. Stip., at ¶ 44.

Active and associate membership rolls reflected a far more moderate increase during the same years. Between July 1981 and July 1984, active and associate mem-

bership increased by less than 3,000 postal supervisors.

All NAPS members except honorary members had to pay membership dues. In the years at issue, active members paid $42.00 in national dues. Active members paid approximately $60.00 in dues to state, local, and district branches of NAPS. Tr., at 75. Associate members paid $21.00 in national dues as well as branch dues.[1] Limited benefit members paid $25.00 in national dues. Limited benefit members did not belong to NAPS branches and therefore did not pay local dues. NAPS deposited national dues into the general treasury of the national organization. Tr., at 75–77.

Limited benefit member dues generated substantial income during the years at issue. In 1981, NAPS collected less than $4,000.00 in limited benefit member dues. The amount of dues collected in 1982 did not rise by more than $5,000.00. However, in 1983, NAPS collected over $580,000.00 in limited benefit member dues. Stip., at ¶ 13. These dues accounted for sixty-four percent of NAPS's total net operating revenues for 1983. Tr., at 18. Similarly, in 1984, NAPS collected nearly $850,000.00 in such dues. Stip., at ¶ 13. Limited member dues therefore accounted for sixty-one percent of NAPS's total net operating revenues by 1984. Tr., at 18. NAPS used these revenues to computerize its offices in 1983. Def.Ex. 14; Tr., at 176.

Upon joining NAPS, active and associate members received a membership kit describing the benefits and activities of the Association. They also received a subscription to *The Postal Supervisor*, NAPS's monthly magazine. Until November 1983, limited benefit members received only the health plan brochure, the insurance underwriter's pamphlet, and a cover letter from

NAPS. Limited benefit members started receiving *The Postal Supervisor* after November 1983.[2] This magazine, and a newsletter periodically sent to post offices, are the only publications that disclose NAPS events and activities. Tr., at 116, 169.

NAPS is not a collective bargaining agent for postal supervisors. However, pursuant to a 1974 agreement with the United States Postal Service (USPS), NAPS has the right to consult about pay issues, fringe benefits, and other programs affecting postal supervisors. *See* Tr., at 95. NAPS also represents postal supervisors in grievance and adverse actions.[3] Limited benefit members do not receive such services from NAPS. Tr., at 94–95.

NAPS performs many other services for its active and associate members. Most notably, NAPS frequently has engaged in lobbying on behalf of postal supervisors. Tr., at 88, 98, 147–49. As early as 1977, NAPS lobbied against restricting cost of living adjustments to retirement annuities. Tr., at 149. In fact, by 1978, NAPS hired a full time legislative counsel to orchestrate its lobbying efforts. Tr., at 128.

In 1981, 1982, and 1983, NAPS lobbied with other federal employee organizations to preserve the civil service retirement system. Tr., at 150–51. Specifically, NAPS objected to replacement of the system with universal social security and sought to preserve cost of living adjustments.

In 1983, NAPS testified before Congress in support of a bill that enhanced Federal Employees Health Benefits Act (FEHBA) benefits. Tr., at 118. NAPS encouraged enactment of seven provisions which benefitted postal supervisors. Tr., at 118–19. NAPS also supported increasing the contributions that the Government makes toward

---

1. The $21.00 in associate member dues covered the following items: $4.00 for the National Association of Postal Supervisors (NAPS) magazine, $3.00 for training activities, $2.00 for national conventions, and $12.00 for administrative costs associated with processing membership. Transcript of Proceedings, No. 99–89T, filed July 26, 1990 (Tr.); at 109.

2. NAPS sent the magazine after advice from counsel that the organization should provide

greater services to limited benefit members to avoid tax problems. Defendant's Exhibits, No. 99–89 T, filed July 26, 1990 (Def.Ex.), 36.

3. Grievance actions involve an allegation of unfair conduct brought by a postal supervisor against the United States Postal Service (USPS). Adverse actions involve proceedings against the supervisor by USPS which could affect pay and scheduling. Tr., at 77–78.

non-postal employee health insurance premium costs. Tr., at 118.

While it lobbied for legislative initiatives that affect all federal employees, NAPS engaged in such legislative advocacy for the benefit of its postal supervisor membership. Tr., at 98. When Mr. Donald Ledbetter, former President of NAPS, testified and lobbied in Congress, he characterized NAPS strictly as an organization of postal supervisors. Tr., at 92–93. Mr. Ledbetter never said that he represented anyone other than postal supervisors. Tr., at 93. Thus, limited benefit members gained only incidental and indirect benefits from such activity.

NAPS offered training and education programs to all its members from 1981 through 1984. Tr. at 89–90. These programs helped members develop lobbying, writing, and speaking skills. Tr., at 90. NAPS's magazine and newsletter announced these activities. Tr., at 116, 169. Information about such programs also spread by word of mouth in post office branches throughout the country. Tr., at 117. NAPS made no specific effort, however, to inform limited benefit members of the training and education programs. Tr., at 169–70.

At its 1984 convention, NAPS considered and passed a resolution enhancing limited benefit membership benefits. Def.Ex. 8. The resolution allowed limited benefit members to participate in meetings, to serve on committees, and to offer technical advice. The Chairman of NAPS explained:

> The reason this resolution is here because, one, these people are getting nothing for their $25—you know, they are paying the premium on the health benefits also in full—but, second, and more important, this was at the urgency and suggestion of our attorneys and legal people because we could be in serious

trouble if we left this $25 as simply a fee and gave the people no participating rights for it.

Def.Ex. 8; Tr., at 185.

NAPS also amended its constitution and bylaws in 1984 to reflect an expanded objective. The amendment proposed the following change:

> The object of this association shall be to promote through appropriate and effective action, the welfare of its members and to cooperate with the United States Postal Service and other agencies of the Federal Government in a continuing effort to improve the Service, to raise the standards of efficiency, and to widen the field of opportunity for those members who make the [Post Office] Postal Service or the Federal Government their life work.

Def.Ex. 21 (emphasis in original).[4] NAPS made this change to avoid characterization of limited benefit member dues as unrelated business or trade income, the same issue tried before this court. Def.Ex. 22; Tr., at 194–95.

### General Operation of FEHBP

OPM oversees FEHBP. Commercial insurance carriers and other organizations that wish to sponsor health plans for federal employees must apply to OPM. OPM reviews the applications and decides who may enter FEHBA.[5] Tr., at 46–47. OPM may enter into renewable one-year contracts with approved applicants. 5 U.S.C. § 8902 (1988). Tr., at 47, 49. OPM must supply to federal employees information on the various health plans it approves. 5 U.S.C. § 8907.

OPM may contract for four types of health benefits plans—service benefit, indemnity benefit, employee organization, and comprehensive medical. 5 U.S.C.

---

4. Underlining denotes additions and bracketing denotes deletions.

5. In 1959, Congress enacted FEHBA for two reasons. First, Congress created Federal Employees Health Benefits Act (FEHBA) to "bring the Government abreast of most private employers...." H.REP. NO. 957, 86th Cong., 1st., *reprinted in* 1959 U.S.CODE CONG. & ADMIN. NEWS 2913, 2914. Comprehensive group health insurance was available to private sector but not federal employees. Second, Congress designed Federal Employees Health Benefits Program (FEHBP) to provide federal employees with a variety of health insurance options. 1959 U.S.CODE CONG. & ADMIN.NEWS, at 2915–16. Tr., at 33.

§ 8903. Under a government-wide service benefit plan, the insurance carrier provides insurance for services performed by designated hospitals and physicians. 5 U.S.C. § 8903(1). Under an indemnity plan, the insurance carrier agrees to pay a fixed amount of money for various types of services. 5 U.S.C. § 8903(2). Employee organization plans offer benefits "which are sponsored or underwritten, and are administered, in whole or in substantial part, by employee organizations ... [and] which are available only to individuals, and members of their families, who at the time of enrollment are members of the organization." 5 U.S.C. § 8903(3).[6] Comprehensive medical plans primarily offer benefits on a prepaid basis. 5 U.S.C. § 8903(4).

FEHBA regulates the rates that insurance carriers and sponsors charge federal employees. In the first place, "[r]ates charged under health benefits plans ... shall reasonably and equitably reflect the cost of the benefits provided." 5 U.S.C. § 8902(i). In the case of service and indemnity benefit plans, rates "shall be determined on a basis which, in the judgment of [OPM], is consistent with the lowest schedule of basic rates generally charged for new group health benefit plans issued to large employers." 5 U.S.C. § 8902(i).[7]

The Government and its employees share the cost of these health insurance premiums. The Government contributes between sixty and seventy-five percent of premium charges incurred by employees in FEHBP. 5 U.S.C. § 8906(b). The Government withholds the employee's share of the cost from his weekly paycheck. 5 U.S.C. § 8906(c).

OPM manages a fund which serves as a repository for premiums paid by the Government and FEHBP enrollees. 5 U.S.C. § 8909. OPM sets aside a portion of the premiums for administrative expenses. 5 U.S.C. § 8909(b). Tr., at 39. Specifically, FEHBP sponsors and carriers receive an allowance for capital expenditures characterized by OPM as administrative expenditures. These expenditures include medical consultants and the maintenance of eligibility files, but not advertising or equipment and facilities "directly used in the delivery of health care services...." 41 C.F.R. § 16–4.153(b); Tr., at 65. OPM, as well as the carrier, also set aside a portion of the premiums as a contingency reserve, which covers losses on exceptional claims that exceed expectations. Tr., at 38.

Carriers and sponsors of health plans do not unilaterally set desired profits. OPM and each carrier or sponsor negotiate a "service charge," which represents a profit on the sale of insurance. 41 C.F.R. § 16–3.808–50. The service charge is the only profit element of FEHBA. Thus, the FEHBP sponsor or carrier may not make a profit on the premium charges themselves.

Every federal employee who wishes to obtain insurance under FEHBP must register by filing with his employing agency a Standard Form 2809. Federal Personnel Manual Supplement 890–1, Federal Employees Health Benefits (Inst. 49) (March 20, 1981) (FPM Supp.), at S5–1. The employing agency then sends copies of the form to the insurance carrier and the appropriate payroll office. FPM Supp., at S13–4.

---

6. In pertinent part, an employee organization is an association or other organization of employees which is national in scope, or in which membership is open to all employees of a Government agency who are eligible to enroll in a health benefits plan under this chapter
   ....
   5 U.S.C. § 8901(8)(A) (1988).

7. OPM further explained in its regulations that FEHBP carriers and sponsors generally set rates under one of two methods. Under the community rate method, premiums equal "that charged on the effective date to all subscriber groups of the carrier for the same contract period for the same level of health benefits." 41 C.F.R. § 16–4.151–2 (1984). The carrier calculates rates "without regard to the differences among subscriber groups in actual or projected utilization of health care services...." 41 C.F.R. § 16–4.151–2. Under the experience rated method, however, the carrier redetermines its premiums "based upon actual cost incurred." 41 C.F.R. § 16–4.152–1(b)(1). Under this method, surpluses and deficits caused by the volume of claims factor into the calculation of premiums for the next year. 41 C.F.R. § 16–4.152–1(b)(2); Tr., at 36.

The insurance carrier must send the employee documentation of enrollment. The carrier and payroll offices are responsible for maintaining records of health plan enrollment. Tr., at 140. OPM, on the other hand, is responsible for depositing payroll withholdings and government contributions into the FEHBP fund, remitting premiums to insurance carriers, and accounting for the FEHBP fund. FPM Supp., at S2–2.

During an open season each fall, individuals may switch to a different FEHBP health plan. Tr., at 41. In 1980, FEHBP experienced a ten-percent shift in enrollment. Tr., at 42. During the 1984 open season, twenty to thirty percent of FEHBP enrollees changed plans. Tr., at 42. The prospect of such shifts prompts competition for enrollees among FEHBP carriers and sponsors. Tr., at 183. As part of the competition, various health plans frequently advertise the benefits of their organization. *See, e.g.,* Tr., at 66.

### The NAPS Health Plan
### Creation and General Operation

Prior to 1978, NAPS had no health insurance plan, Tr., at 79, but offered only automobile and life insurance to postal supervisors.[8] Tr., at 79. As a consequence, NAPS members had to purchase health insurance from other organizations or commercial carriers. Def.Ex. 17.

In 1979, NAPS applied to OPM to become a participant in FEHBP. Tr., at 130. NAPS presented a health plan which qualified as an employee organization plan under 5 U.S.C. § 8903(3). NAPS opened participation to all federal employees who were members of NAPS. NAPS gained entry into FEHBP and began sponsoring a health plan in 1980. Tr., at 131. NAPS selected Mutual of Omaha as its underwriter. Tr., at 130. OPM employed an experience rating method to compute premiums under the NAPS health plan. Thus, premiums were a function of projected claims and expenses as well as surpluses or deficits incurred in past years. Stip., at ¶ 30.

While not a separate entity from the health plan, NAPS maintained separate books and accounts. Premiums paid by enrollees funded the daily operations of the health plan. Enrollees' payroll offices deducted premiums from paychecks and remitted them to OPM. Stip., at ¶ 22; Tr., at 141. OPM kept a percentage of the premiums for a contingency reserve and administrative costs. OPM remitted the remainder to the underwriter.

NAPS leased office space and equipment to the health plan. In 1983, NAPS purchased computer equipment to automate the processing of limited benefit membership applications from non-postal employees who joined the health plan. Tr., at 176. NAPS paid for this system with general treasury funds. Tr., at 176.

Under its contract with OPM, NAPS received limited reimbursement for administrative costs. Specifically, NAPS would receive the lower of actual costs or one and one-half percent of premium charges. NAPS received one and one-half percent of premiums in the years at issue. This reimbursement did not cover the plan's cost of leasing office space and equipment from NAPS. Stip., at ¶ 35. NAPS also did not receive reimbursement for advertising, printing plan brochures, printing limited benefit member dues forms, or postage on promotional materials. Tr., at 65.[9] NAPS

---

**8.** In the original 1959 Act, only employee organizations that had health plans in existence before July 1, 1959 could participate in FEHBP. 1959 U.S.CODE CONG. & ADMIN.NEWS, at 2920. Congress permitted this limited entry at least in part to avoid placing undue hardship on employee organizations' plans that already were in existence. *See,* S.REP. NO. 468, 86th Cong., 1st Sess. 9 (1959). In 1963, Congress amended FEHBA to allow additional employee organizations into FEHBP. Congress permitted this expansion because employee organizations which could not participate in FEHBP were losing membership to organizations that could provide health benefits. *See,* H.R.REP. NO. 190, 86th Cong., 1st Sess. 2 (1959). In 1978, Congress again authorized OPM to allow additional employee organization plans into FEHBP. OPM ultimately approved six new plans under this open window.

**9.** For advertising and promotion of the health plan, NAPS spent $10,625.51 in 1983 and $19,943.00 in 1984. Stipulation, filed July 6, 1990 (Stip.), at ¶ 37. NAPS budgeted for $50,000.00 in advertising for 1985. Between 1980 and

therefore paid for such expenses out of its general treasury.

While NAPS could have received a service fee, which represents profit on the health plan, it declined. Tr., at 53. OPM remitted the service fee directly to NAPS's carrier—Mutual of Omaha. NAPS received no other payments from OPM or Mutual of Omaha in connection with the health plan.

While NAPS received no profits from the health plan premiums, it nevertheless maintained a competitive health plan. Tr., at 183. NAPS changed health plan benefits to maintain or broaden its share of the market. Tr., at 183. In 1980, NAPS sought to add limited dental coverage because this change would "continue to make [NAPS] price competitive...." Def.Ex. 19. Similarly, in 1981, NAPS proposed enhancing hospice care and catastrophic coverage. Def.Ex. 20. NAPS wanted these changes "to maintain competitive benefit offerings." Def.Ex. 20. NAPS further maintained that the added price to insureds for enhanced coverage would not stymie price competition with other FEHBP plans. Def.Ex. 20.

*Plan Eligibility and Enrollment*

When NAPS's health plan first took effect in 1980, only active and retired postal supervisors could join. Tr., at 132. Postal supervisors were the only persons characterized as members of NAPS under the constitution at that time. Def.Ex. 3. Shortly after the plan began, however, NAPS received requests to join the plan from federal employees who were not postal supervisors. Tr., at 133. By opening up the plan to all federal employees, NAPS increased the size of the insurance pool and obtained better benefits at a lower cost.

To expand the plan but remain within the legal requirement that insureds be members of the employee organization, NAPS

believed that it had to create a form of membership which would cover federal employees generally. Def.Ex. 6, 7.[10] Thus, NAPS's Executive Committee passed a resolution in March 1980 recommending creation of the limited benefit member class. Def.Ex. 6. In pertinent part, the resolution provided that limited benefit membership was for the sole purpose of obtaining insurance. Def.Ex. 6.

Mr. Maurice Twomey, Executive Vice President of NAPS, presented the committee with estimates showing that each limited benefit member would require NAPS to absorb between $12.00 and $15.00 in administrative costs. Tr., at 136. He also indicated that other organizations were charging between $20.00 and $40.00 for similar membership. Tr., at 83, 171. The committee included in the resolution a provision requiring limited benefit members to pay $25.00 national dues. Further, as part of the justification for the resolution, the committee stated that "[i]t is necessary to continue to look at budgeting needs for operation of NAPS and inflation is raising the costs of operating...." Def.Ex. 6.

At the 1980 NAPS convention, an officer introduced the Executive Committee resolution. The officer explained that expanding the size of the plan would lead to better health insurance benefits. He further explained that the membership scheme is "strictly legal." Def.Ex. 7. Specifically, "[i]n order that [federal employees generally] be eligible to belong to [NAPS'] National Health Program, they must enjoy some type of membership in our Association." Def.Ex. 7.

The convention passed the Executive Committee's resolution. The amendment to the Constitution stated:

> Any federal employee, other than those who are eligible for membership in NAPS, may become a limited benefit

1982, NAPS spent $18,777.00 on brochures, $9,110.00 on limited benefit member dues forms, and $975.00 on postage for promotional activities. Stip., at ¶ 38.

**10.** NAPS's belief likely stemmed from the definition of an employee organization plan contained in FEHBA, which reads:

> Employee organization plans ... which are available only to individuals ... who at the time of enrollment are members of the organization.

5 U.S.C. § 8903(3).

member for the sole purpose of obtaining the Supervisors Health Benefit Plan upon the payment of annual dues of $25.00.

Def.Ex. 4.

Limited benefit members were not able to enroll in the NAPS health plan until 1981. From 1981 through 1984, all limited benefit members in NAPS were also enrolled in the health plan. If a limited benefit member cancelled or dropped enrollment in the health plan, he lost membership status in NAPS. Tr., at 111. Active or associate members who cancelled or dropped the health plan, however, could remain members of NAPS. Tr., at 111.

Between 1981 and 1984, the NAPS health plan experienced a dramatic rise in enrollment. The entry of non-postal federal employees principally fueled this increase in health plan membership. Tr., at 19. In 1981 and 1982, limited benefit members constituted a respective seven percent and thirteen percent of the health plan's enrollment. Tr., at 19. By 1983 and 1984, however, limited benefit members were a respective sixty-eight percent and seventy-one percent of total membership in the health plan. Tr., at 19.

### Claims Court Action

For the 1983 tax year, the IRS determined that NAPS realized $581,658.39 in gross income from limited benefit member dues. The IRS therefore concluded that NAPS owed $183,955.86 in additional tax for 1983. For the 1984 tax year, the IRS determined that NAPS realized $845,021.21 in gross income from limited benefit member dues. The IRS concluded that NAPS owed $311,466.05 in additional taxes for 1984. IRS's investigation did not involve any portion of the health plan's premium income.

As a result of IRS's determination, NAPS paid $696,369.59 for unpaid taxes plus interest. NAPS thereupon filed timely claims for refund with the IRS in March 1988. The IRS did not respond to NAPS's claim within six months. Thus, on February 27, 1989, NAPS filed a complaint with the United States Claims Court seeking a refund of $696,369.51 plus statutory interest.

### DISCUSSION

The Internal Revenue Code imposes a tax on the unrelated business income of tax-exempt entities. 26 U.S.C. § 511(a)(1). Labor organizations like NAPS are subject to § 511. 26 U.S.C. § 511(a)(2)(A). The unrelated business taxable income of an otherwise exempt organization equals the gross income from the unrelated activity less deductions. 26 U.S.C. § 512(a).

■ Section 513 of the Internal Revenue Code generally defines unrelated trade or business as:

> [A]ny trade or business the conduct of which is not substantially related ... to the exercise or performance by such organization of its ... purpose or function constituting the basis for its [tax] exemption....

26 U.S.C. § 513(a). Trade or business similarly includes "any activity which is carried on for the production of income from the sale of goods or the performance of services." 26 U.S.C. § 513(c). The Internal Revenue Code therefore places great weight on the motivation for the activity as well as the tax-exempt purpose of the organization.

Treasury Regulations and Supreme Court precedent consistently have set forth a three-part test for ascertaining whether a tax-exempt organization has generated unrelated business taxable income. Treasury Regulation § 1.513–1 states:

> [G]ross income of an exempt organization ... is ... unrelated business taxable income if: (1) It is income from trade or business; (2) such trade or business is regularly carried on by the organization; and (3) the conduct of such trade or business is not substantially related ... to the organization's ... exempt functions.

26 C.F.R. § 1.513–1(a) (1985); *see also, United States v. American Bar Endowment,* 477 U.S. 105, 109–10, 106 S.Ct. 2426, 2429, 91 L.Ed.2d 89 (1986).

The parties have stipulated that NAPS's health plan provided insurance to limited benefit members on a regular basis. Stip., at ¶¶ 15, 53. NAPS also regularly collected $25.00 annual dues from limited benefit members. Thus, this court need only address two issues. First, did NAPS generate profit from a trade or business? Second, is the activity at issue substantially related to the tax-exempt purpose of NAPS?

### Trade or Business

Congress imposed the unrelated business income tax primarily to "prevent tax-exempt organizations from competing unfairly with businesses whose earnings were taxed." *American Bar Endowment*, 477 U.S. at 114, 106 S.Ct. at 2432. Prior to enactment of 26 U.S.C. § 511, tax-exempt organizations could avoid taxation simply by using profits in furtherance of their tax-exempt purposes. See discussion in *United States v. American College of Physicians*, 475 U.S. 834, 838, 106 S.Ct. 1591, 1594, 89 L.Ed.2d 841 (1986). Consequently, "tax-exempt organizations were able to carry on full-fledged commercial enterprises in competition with corporations whose profits were fully taxable." *American College*, 475 U.S. at 838, 106 S.Ct. at 1594.

Section 511 restrained this unfair competition "by placing the unrelated business activities of certain exempt organizations upon the same tax basis as the nonexempt business endeavors with which they compete." 26 C.F.R. § 1.513–1(b). However, "where an activity does not possess the characteristics of a trade or business ... the unrelated business income tax does not apply since the organization is not in competition with taxable organizations." *Id.*

■ To target activities which present a likelihood of unfair competition, Treasury Regulations have defined trade or business as something "carried on for the *production of income and* which otherwise possesses the *characteristics required to constitute 'trade or business'* within the meaning of section 162 [26 U.S.C. § 162]...." *Id.* (emphasis added). In ap-

plying the second part of this regulation—possession of trade or business characteristics—courts have looked to two alternative formulas. Some courts look to the general standard for finding a trade or business under 26 U.S.C. § 162—whether the taxpayer's primary purpose for engaging in the disputed activity is to generate profit. *Professional Ins. Agents of Michigan v. Commissioner*, 726 F.2d 1097 (6th Cir. 1984); *Carolinas Farm & Power Equip. Dealers v. United States*, 699 F.2d 167 (4th Cir.1983); *Louisiana Credit Union League v. United States*, 693 F.2d 525 (5th Cir.1982). Other courts, in an effort to reconcile the purposes of § 511 with the definition of trade or business, have focused on whether the tax-exempt entity conducts its activity in a competitive, commercial manner. *See Illinois Ass'n of Professional Ins. Agents v. Commissioner*, 801 F.2d 987 (7th Cir.1986); *Disabled Am. Veterans v. United States*, 227 Ct.Cl. 474, 650 F.2d 1178 (1981).

In sum, then, NAPS's limited benefit member insurance and dues collection activities constitute a trade or business if they satisfy a two-pronged test. First, does NAPS produce income through production of goods or performance of services? Second, does NAPS's activity have the characteristics of a § 162 trade or business? NAPS's activity falls within the second prong if NAPS had a profit motive *or* engaged in competition with taxable entities.

### Production of Income

■ To determine whether NAPS engaged in a trade or business, this court first must ascertain whether the money collected from limited benefit members constituted dues or income from the sale of insurance. 26 C.F.R. § 1.513–1(b); *American Bar Endowment*, 477 U.S. at 110–11, 106 S.Ct. at 2429–30. The trial record shows that the $25.00 paid by limited benefit members was a straight fee for access to insurance services.

In the first place, limited benefit members were not, as plaintiff contends, *bona*

*fide* members of NAPS.[11] In the 1980 NAPS constitution, which NAPS did not amend until 1984, the stated purpose of the organization was "to widen the field of opportunity for its members who make the Post Office their life work." Def.Ex. 4. While the 1980 constitution allowed limited benefit members to join the organization, they only could purchase health insurance. Article III reads:

> Any federal employee, other than those who are eligible for membership in NAPS, may become a limited benefit member for the sole purpose of obtaining the Supervisors Health Benefit Plan upon the payment of annual dues of $25.00.

Def.Ex. 4. Limited benefit members could not vote, hold elected office, serve on committees, or offer technical advice. In describing this constitutional provision at the 1980 convention, an executive committee member stated that it was "strictly legal" and simply aimed at increasing membership in the health plan. Def.Ex. 7, at I, 122–23.

Limited benefit membership in NAPS had no meaning other than an opportunity to participate in the health plan. NAPS solicited limited benefit members to join the health plan, not NAPS. Tr., at 107. Their membership lasted only so long as they remained in the health plan. Active and associate members, however, could join NAPS without enrolling in the health plan and could drop the health plan without affecting their NAPS membership. Tr., at 111.

Key NAPS officers who served during the years at issue testified that limited benefit members simply participated in the insurance program. Mr. Donald Ledbetter, a respected President of NAPS for 16 years until his retirement in 1986, testified that representation of postal supervisors is and always has been the basic function of

NAPS. Tr., at 96–97. Further, he identified NAPS as an organization composed only of postal supervisors when testifying before Congress. When asked why, Mr. Ledbetter replied, "[t]hat's basically what the organization was all about." Tr., at 108. Further, during a 1985 deposition in another case, Mr. Ledbetter stated that limited benefit members received nothing but membership in the health plan for $25.00. Def.Ex. 36.

Mr. Twomey, Executive Vice President during the years at issue, also testified that limited benefit members were not *bona fide* members of NAPS. Mr. Twomey testified that NAPS's purpose is consistent with the tax exemption affidavit filed by NAPS in 1949:

> [Question:] State briefly the specific purposes for which the organization was formed.
>
> [Answer:] ... Social and economic advancement of Postal Supervisors and improvement of the Postal Service.

Def. Ex. 2, at 2; Tr., at 160. Mr. Twomey further noted that NAPS created the special limited benefit member class specifically to ensure that general federal employees did not dilute the domination of postal supervisors in the organization. Tr., at 161–62.

The state of affairs at NAPS during the years at issue corroborates this court's reading of the organization's constitution and the trial testimony. From 1980 through 1984, limited benefit members received no other benefits except the opportunity to enroll in the health plan. NAPS consulted with the Government on the pay policies, scheduling, and fringe benefits of postal supervisors only. Tr., at 94–95. NAPS similarly represented only postal supervisors in grievance and adverse actions. Tr., at 94–95.

---

11. Plaintiff appears to have questioned the appropriateness of looking to the *bona fide* status of members. According to plaintiff, it was not until 1985 that Congress required employee organizations to make health plans available to full members only. The 1985 provision postdates the issues in this litigation and does not apply. While plaintiff correctly notes this legislative history, it misstates the nature of this inquiry. Defendant, and now this court, do not question whether NAPS may admit less than full members into its plan; the 1985 provision clearly does not apply. Having assumed that less than full members may enter the health plan, the pertinent question is whether non-premium payments from these less than full members constitute taxable income.

NAPS did lobby on legislative initiatives that affected all federal employees, including postal supervisors. Yet, NAPS did not actually represent limited benefit members. They only benefitted incidentally. The IRS exemption affidavit, which NAPS has not amended since 1949, states that the organization engages in activities to secure "the enactment of legislation in the interest of postal supervisors." Def.Ex. 2, at 2; Tr., at 98.

NAPS nevertheless contends that it lobbied in favor of increasing Government contributions toward the health insurance premiums of non-postal employees. Yet, the legislation contained seven other provisions that impacted postal supervisors. Tr., at 118–19. Further, in 1977, long before limited benefit membership existed, NAPS lobbied for legislation which benefitted all federal employees including postal supervisors. Tr., at 149–50. Thus, this court cannot conclude from the evidence that NAPS provided lobbying services for limited benefit members.

NAPS offered training programs that were open to all members of the organization, including limited benefit members. Yet, these activities were not really intended for limited benefit member access. Mr. Twomey testified that NAPS never made an effort to target or notify limited benefit members of upcoming training events. Tr., at 169. Further, when soliciting potential limited benefit members, NAPS did not tell them about any benefits or opportunities offered by the organization other than the health insurance. Tr., at 101–02. Thus, while NAPS's phone number was on the health plan brochure, Tr., at 212, limited benefit members would not have known to use it to inquire about activities.[12]

Plaintiff notes that limited benefit members could have found out about events through NAPS's magazine and newsletter. Limited benefit members, however, did not start receiving the magazine until late 1983. Further, NAPS only distributed the newsletter to post office branches. Tr., at 117.

Even on health plan issues, NAPS did not consider the input of limited benefit members. Mr. Twomey testified that he attended meetings around the country eliciting comments and questions about the health plan. The meetings, however, predominantly were "postal employee" gatherings. Tr., at 156.

NAPS itself acknowledged that limited benefit members received no benefits except insurance when it amended the organization's constitution in 1984. NAPS amended the objective of the organization to include the welfare of all federal employees, Def.Ex. 21, and enhanced limited benefit member participation rights in the organization. Def.Ex. 8. The chairman of the 1984 convention explained to the delegates:

> The reason this resolution is here because, one, these people [limited benefit members] are getting nothing for their $25—you know, they are paying the premium on the health benefits also in full....

Def.Ex. 8.

In sum, the plain meaning of NAPS's 1980 constitution, the perceptions of the organization's key officers, the dearth of services actually received by limited benefit members, and the 1984 constitutional change all indicate that limited benefit members were not really members of NAPS. Rather, limited benefit members simply paid $25.00 for the opportunity to obtain insurance under the NAPS health plan. NAPS therefore offered services and, in return, obtained gross receipts.

*Profit Motive*

The parties disagree on what evidence this court should consider in deciding whether plaintiff intended to profit from the $25.00 dues. NAPS relies primarily on representations of its officers and the organization's refusal to take a profit on insurance premiums. Defendant, however, relies primarily on NAPS's consistent profit-

---

**12.** Whether or not NAPS told limited benefit members about upcoming activities, it is unrealistic to think that enrollees in the health plan would have used the phone number to inquire about anything other than the health plan. The only natural reason for such a phone number in the brochure is to provide a point of contact for health benefits questions.

making on the limited benefit member dues activity.

■ The repeated incidence of profit-making may help show the motive to make a profit. The United States Court of Appeals for the Seventh Circuit, for example, has discounted self-serving testimony and instead has considered the proportion of revenues to expenses. *Illinois Ass'n,* 801 F.2d at 992. The Fourth and Fifth Circuits similarly have noted that consistent realization of profit, among other factors, shows a profit motive. *Carolinas Farm,* 699 F.2d at 169–70; *Louisiana Credit Union League v. United States,* 501 F.Supp. 934 (E.D.La.1980), *aff'd* 693 F.2d 525 (5th Cir. 1982).

NAPS consistently made a profit from the limited benefit member dues. In 1983, limited benefit member dues accounted for $581,658.00 in revenues. An IRS audit showed that NAPS had only $79,632.25 in expenses attributable to limited benefit membership in 1983. Similarly, in 1984, NAPS made $845,021.00 in limited benefit member dues. The same IRS audit showed, however, that NAPS incurred only $121,640.36 in expenses in 1984. Thus, in 1983 and 1984, though each limited benefit member cost NAPS less than $4.00, NAPS charged $25.00.

Further, NAPS's 1983 and 1984 operating expenses dropped while limited benefit member dues income increased markedly. Limited benefit member dues consequently became a significant share of NAPS's net operating revenues during the years at issue. By 1983 and 1984, limited benefit member dues represented over 60 percent of the organization's revenues. Tr., at 18. Despite the significant profit on limited benefit member dues, NAPS made no effort to lower the $25.00 fee. Rather, NAPS separately reported limited benefit member dues income in its financial reports every year. Def.Ex. 33, 34.

NAPS knew before setting the limited benefit member dues that each individual would cost the organization less than $25.00. Mr. Twomey told the Executive Committee that each limited benefit member would cost NAPS approximately $12.00–$15.00 in administrative expenses. Tr., at 136. In light of the $21.00 associate member dues, Mr. Twomey's estimate was reasonable.[13] Despite the surplus revenue on the limited benefit member fee and the estimate supplied by Mr. Twomey, the Executive Committee chose to recommend $25.00 dues in its resolution. NAPS's Executive Committee set the $25.00 dues with knowledge that this rate would generate profits.

At the 1984 convention, NAPS acted on its knowledge that limited benefit member dues yielded significant profits. Before and during the 1984 convention, NAPS worried that revenue from limited benefit member dues would constitute taxable income. Def.Ex. 8, 22. Consequently, at the convention, NAPS made cosmetic changes to limited benefit membership to prevent IRS from characterizing the dues as unrelated business income. Def.Ex. 8. NAPS still chose not to cut back on its profits but instead made no-cost changes to the indicia of limited benefit membership.

NAPS has not offered evidence sufficient to counter the objective manifestations of profit motive in this case. NAPS's officers stated that they did not consider making a profit. Yet, the officers did not explain why they chose to charge $25.00 in the face of evidence that each limited benefit member would cost only $12.00–$15.00. Mr. Twomey could not say why the Executive Committee reached the $25.00 figure. Tr., at 171–72. Mr. Ledbetter testified that he thought $25.00 would be a nominal sum. Specifically, he noted that NAPS competed with other organizations which had entry fees as high as $40.00. Tr., at 83. These comments do not explain, however, why NAPS chose to charge more than Mr. Twomey's estimate. In fact, Mr. Ledbetter's testimony suggests that NAPS set the fee on the basis of price competition, not

---

**13.** After subtracting fees for training programs, the national convention, and the magazine, associate member dues yielded a surplus of $12.00 for other administrative expenses. Tr., at 109–10.

merely with a view toward meeting expenses.

Plaintiff further contends that consistent profits are not evidence of intent in this case. Open season occurs in November of each year. Tr., at 41. As a consequence, NAPS asserts that it knew how much revenue it would collect only at the end of the year. NAPS also notes that it could not change the $25.00 fee until 1984 because the organization changes the constitution biennially. These arguments do not explain, however, why the Executive Committee chose at the outset a dues amount well above cost. Plaintiff also has not explained why it did not reduce the fee in 1984, when each limited benefit member cost NAPS less than $4.00. At that time, neither declining membership nor increasing costs warranted such a huge financial cushion. Thus, the record shows that plaintiff intended to realize a profit from the $25.00 limited benefit member dues.

*Unfair Competition*

Some courts have articulated an alternative test for ascertaining whether an activity constitutes a trade or business:

> [W]hether the tax-exempt organization enjoys an unfair competitive advantage over tax-paying entities engaged in similar activities or ... whether the activity is conducted in a competitive, commercial manner.

*Illinois Ass'n*, 801 F.2d at 990; *see also, Disabled Am. Veterans*, 227 Ct.Cl. at 488–90, 650 F.2d 1178. NAPS behaved as a competitor in the private market. Therefore, NAPS's tax-exempt status gave it commercial advantages over taxable entities.

NAPS competed openly with commercial insurance carriers. NAPS competed with the government-wide Aetna and Blue Cross plans that are part of FEHBP. Tr., at 66, 183. During open season, NAPS endeavored to convince employees to switch to its health plan. Tr., at 183. Further, NAPS strived to maintain competitive benefit offerings. NAPS has shaped the health plan so as to attract new participants and maintain existing enrollees. Tr., at 183. At all times, NAPS structured the plan "to give the best possible benefits ... for the lowest premium dollar...." Tr., at 139. NAPS always proposed changes in benefits with a view toward remaining price competitive. Def.Ex. 19, 20.

NAPS did not, however, always compete with commercial insurance carriers on a level playing field. For example, NAPS used tax-free dollars to advertise the health plan during the years at issue. Advertising was an expense borne by the general treasury, which is the repository of limited benefit member dues. NAPS spent over $25,000.00 in non-taxable general treasury funds to promote the health plan in 1983 and 1984. NAPS budgeted for an additional $50,000.00 in promotion costs for 1985.

In 1983, NAPS purchased computer equipment to process applications of limited benefit members desiring to join the health plan. Def.Ex. 14; Tr., at 175. Limited benefit member dues went toward purchase of this capital. Tr., at 176. Further, for tax years 1983 and 1984, NAPS incurred over $200,000.00 in administrative expenses to service the limited benefit member class. Expenses included printing brochures, paying legal fees, and processing membership applications. OPM did not reimburse such costs and NAPS therefore funded these expenses from the general treasury.

In contrast, commercial carriers must pay their promotional and capital expenditures with after-tax dollars. As a consequence, commercial carriers must generate more revenue than NAPS to pay for an equal amount of costs. Similarly, a commercial carrier will receive less of an OPM reimbursement than entities like NAPS which buy goods with tax-exempt funds. *See, e.g.,* Tr., at 265.

Thus, use of tax-free dollars gives NAPS an unfair competitive advantage. Thus, under this alternative test as well, offering general federal employees the opportunity to obtain insurance for a $25.00 fee constitutes a trade or business.

*Substantial Relationship to Purpose*

To avoid unrelated business taxable income, a tax-exempt entity must show that

the disputed activity is substantially related to its tax-exempt purpose. Treasury Regulations state:

> Gross income derives from 'unrelated trade or business' ... if the conduct of the trade or business which produces the income is not substantially related ... to· the purposes for which exemption is granted.

26 C.F.R. § 1.513–1(d)(1). Thus, the Treasury Regulations require an "examination of the relationship between the business activities which generate the particular income in question ... and the accomplishment of the organization's exempt purposes." 26 C.F.R. § 1.513–1(d)(1). NAPS's performance of services "must contribute importantly to the accomplishment of [its tax-exempt] purposes." 26 C.F.R. § 1.513–1(d)(2). Thus, this court must seek a substantial causal relationship between the activity at issue and the organization's tax-exempt function.

■ Courts generally have considered several factors to determine whether an activity relates substantially to an organization's tax-exempt purpose. First, the activity must "benefit ... membership as a group, rather than in their individual capacities." *Professional Ins. Agents*, 726 F.2d at 1103.

Second, the court should ascertain whether the fees charged by the organization are directly proportional to the benefits that individuals receive. *Illinois Ass'n*, 801 F.2d at 993; *Carolinas Farm*, 699 F.2d at 171; *Professional Ins. Agents*, 726 F.2d at 1104. The Sixth Circuit explained:

> Services which render benefits according to the fee that is paid for them are taxable business activities, not tax exempt services. Were we to adopt another rule people would attempt to market

all services and products under the aegis of a tax exempt organization.

*Professional Ins. Agents*, 726 F.2d at 1104.

Third, an activity is less likely to be substantially related to an organization's tax-exempt purpose if "the service provided ... is one commonly provided by for-profit entities." *Carolinas Farm*, 699 F.2d at 171; *see also, Illinois Ass'n*, 801 F.2d at 993. Under these standards, providing insurance to federal employees generally and extracting a $25.00 fee is not substantially related to NAPS's tax-exempt purpose.

■ The tax-exempt purpose of NAPS is to secure "the social and economic advancement of postal supervisors." Def.Ex. 2. Both Mr. Ledbetter and Mr. Twomey testified that the primary purpose of NAPS is to represent and protect postal supervisors. Tr., at 71, 96, 107, 108, 158, 160. The Postal Service and NAPS even have an agreement which entitles NAPS to consult with USPS about pay, scheduling, and benefits issues that affect postal supervisors. Def.Ex. 1. Limited benefit members, however, are not postal supervisors. Rather, these individuals are federal employees who have no interest in the Postal Service. Thus, providing insurance to limited benefit members is not substantially related to the organization's tax-exempt purpose.

The 1984 amendments to NAPS's constitution demonstrate that providing insurance to limited benefit members in 1983 and 1984 was not consistent with the organization's purpose. NAPS expanded its purpose to include the advancement of all employees who make the Government their life's work. NAPS officers did not tell the 1984 convention that this amendment clarified the existing purpose of NAPS. Rather, NAPS made this and other changes to avoid taxation of limited benefit member dues as unrelated trade or business income. Def.Ex. 8, 22.[14] Further, Mr. Twomey ad-

---

**14.** A delegate to the convention explained:

> We do indeed have some tax problems. I don't want to go into them. I simply don't want to discuss on the record what they are, but they are very important that we do them right. It is very important that we handle this whole thing right. It is also very important that we change the bylaws to recharacterize

our members as not limited benefit members but as Federal members. And that is being done.

And there are a number of attendant problems that we have to watch very closely; a lot of money is at stake.

Def.Ex. 22.

mitted in his testimony before this court that the 1984 changes were to avert the very subject of this litigation. Tr., at 194. Thus, NAPS has not proved that its tax-exempt purpose was to assist all federal employees and that providing insurance to limited benefit members was consistent with this function.

NAPS asserts, however, that opening the plan to non-postal supervisors provides better health benefits for postal supervisors enrolled in the plan. Specifically, by expanding the size of the insurance pool, NAPS could provide a greater range of benefits at lower cost. In this way, NAPS advanced the economic well-being of postal supervisors. However, the proper focus of a substantial relationship inquiry is not whether each member receives pecuniary gain. Rather, NAPS must show that the activity advances the purposes of the group as a whole. *Professional Ins. Agents*, 726 F.2d at 1104.

NAPS similarly argues that one valid purpose of a labor organization is to provide insurance to all its members. NAPS cites to an IRS ruling, which states:

> [L]abor organizations were exempted [from taxation] for the very reason that they operated, in part, as mutual benefit organizations providing death, sick, accident and similar benefits to their members.

Rev.Rul. 62–17, 1962–1 C.B. 87. NAPS, however, was not merely providing health insurance to its members. In tax years 1983 and 1984, limited benefit members were not really members of NAPS. They merely paid a $25.00 fee to gain access to health insurance from a government-wide plan.

In the alternative, NAPS contends that FEHBA expanded the tax-exempt purpose of federal employee organizations to cover sponsorship of government-wide health insurance plans. Pl.Br., at 35, 39. Thus, plaintiff argues that FEHBA itself broadened NAPS's mandate to include provision of insurance to all federal employees.

The language and history of FEHBA, however, do not support NAPS's attempt to link the organization's purpose and its sponsorship of a government-wide health plan. Specifically, FEHBA permitted, but did not require, employee organizations to offer open insurance plans. In 1959, Congress permitted employee organizations to enter FEHBP, but only to avoid imposing hardship on organizations that already had plans. S.REP. NO. 468, at 9. In 1963, Congress allowed additional employee organizations to enter FEHBP, but again only to avoid imposing hardship on such organizations. Specifically, if an employee organization was not in FEHBP, it could not compete effectively for membership with organizations that participated in FEHBP. H.R.REP. NO. 190, at 2. In 1985, Congress opened the window for entry of additional organizations, but limited membership in the plans to *bona fide* members of the sponsoring organization.

Thus, FEHBA permitted organizations with purposes otherwise consistent with provision of insurance to join the program. FEHBA did not amend any organization's charter or otherwise require organizations to provide insurance. Moreover, Congress did not admit employee organizations to further FEHBP's objectives. If Congress needed employee organizations to participate in order to ensure FEHBP's success, it would have allowed all employee organizations to participate in FEHBP at the outset, and, in 1985, would not have limited enrollment to *bona fide* members.

Even if plaintiff could establish that FEHBA somehow made sponsorship of a government-wide health plan one of the purposes of an employee organization, it simply does not follow that Congress intended membership dues to be tax-exempt. Plaintiff has not pointed to any legislative history where Congress addressed the tax-exempt status of employee organizations in the context of health plan sponsorship.

The nature of NAPS's activity further militates against finding a substantial relationship between the organization's tax-exempt purpose and providing insurance to limited benefit members. First, the $25.00 charge pertains only to the insurance services. Limited benefit members in fact receive nothing but insurance for the mem-

bership fee. NAPS's officers admitted this state of affairs at trial, at the 1984 convention, and in other litigation. Def.Ex. 8, 36; Tr., at 107. Thus, the fee charged is proportional to the benefit received.

Further, providing health insurance to a general class of employees is not a function peculiar to tax-exempt labor organizations. By and large, providing insurance services is a for-profit enterprise. Even OPM allows a profit in the form of a service fee. NAPS promoted and administered its plan as would any private, commercial entity.

In sum, then, NAPS has not shown that performance of insurance services for limited benefit members and collection of $25.00 importantly advances the organization's purpose. Consequently, NAPS's activity meets the third criterion for unrelated business taxable income.

### The United Postal Workers Case

NAPS cites to *American Postal Workers Union v. United States,* 90–1 USTC ¶ 50,013 (D.D.C.1989), (*PWU*) to support its position that limited benefit member dues are not taxable income. Defendant distinguishes the case at bar from *PWU.* This court addresses *PWU* because the parties have made the case an important part of their written submissions and closing arguments.

In *PWU,* the district court found that dues paid by general federal employees to the Postal Workers Union (the Union) in consideration for membership rights and health plan membership was not unrelated business taxable income. The court underscored several facts which indicated that general federal employees were *bona fide* members and that the Union had no profit motive. First, the organization's constitution stated that the Union represented all federal classified employees, not just postal workers. Second, the Government "introduced no evidence showing that *APWU* [*v. United States,* 1989 WL 165581] does not promote and foster the economic and social interests of all federal employees...." 90–1 USTC ¶ 50,013, at 83,051. In fact, the Government conceded that the organization did a good job advocating the interests of federal employees generally. Third, the Union health plan ran a deficit "because the union focused on providing high quality, low cost benefit to its members rather than on making a profit." *Id.* at 83,053.

These facts distinguish *PWU* from the case at bar. Unlike the Union, NAPS's constitution did not purport to protect all federal employees during the years at issue. Rather, NAPS's constitution specifically addressed the well-being of postal supervisors only. In this case, defendant has shown that NAPS did not directly advance the interests of limited benefit members aside from providing health benefits. Unlike *PWU,* NAPS was sensitive to its cash flow and profits. When the Executive Committee resolved to charge $25.00 limited benefit member dues, it justified the recommendation in part because of "budgeting needs" and "the cost of operating." Def.Ex. 6, at 215. Thus, *PWU* actually supports the IRS's decision to tax NAPS.

### CONCLUSION

Providing insurance to limited benefit members and collecting $25.00 dues constitutes unrelated business taxable income under 26 U.S.C. § 511. First, NAPS provided the opportunity to obtain insurance in return for a $25.00 fee. NAPS intended to profit from this activity and, because of its tax-exempt status, had an unfair competitive advantage over commercial insurance carriers.

Second, providing such insurance services was not substantially related to NAPS's tax-exempt purpose—the advancement of postal supervisors. NAPS conducted such insurance activity on a regular basis. The court therefore directs the Clerk to dismiss plaintiff's complaint.

No costs.